459 F.2d 1231
 3 ERC 1143, 3 ERC 1806, 3 ERC
1811, 19 A.L.R.Fed. 854,
148 U.S.App.D.C. 207, 1 Envtl. L. Rep. 20,572,
2 Envtl. L. Rep. 20,092
 D. C. FEDERATION OF CIVIC ASSOCIATIONS et al., Appellants
v.
John A. VOLPE, Secretary of Transportation, et al.
D. C. FEDERATION OF CIVIC ASSOCIATIONS et al.
v.
John A. VOLPE, Secretary of Transportation, Appellant
The District of Columbia, et al., Walter J. Hickel,
Secretary of Interior, et al., Appellants.
 Nos. 24838, 24843.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued July 22, 1971.
Decided Oct. 12, 1971.
Dissenting Opinion Filed Nov. 4, 1971.
Supplemental Opinion and Denial of Rehearing March 2, 1972.
Certiorari Denied March 27, 1972.
See 92 S.Ct. 1290.
 
 Messrs. Roberts B. Owen and Gerald P. Norton, Washington, D. C., for appellants in No. 24,838 and appellees in No. 24,843.
 Mr. Thomas L. McKevitt, Atty., Department of Justice, with whom Asst. Atty. Gen. Shiro Kashiwa, Messrs. Thomas A. Flannery, U. S. Atty., Joseph M. Hannon, Asst. U. S. Atty., and Edmund B. Clark, Atty., Department of Justice, were on the brief, for federal appellees in No. 24,838 and federal appellants in No. 24,843.
 Mr. John R. Hess, Asst. Corporation Counsel for the District of Columbia, with whom Messrs. C. Francis Murphy, Corporation Counsel, and Richard W. Barton, Assistant Corporation Counsel, were on the brief, for D. C. appellees in No. 24,838 and D. C. appellants in No. 24,843.
 Before BAZELON, Chief Judge, FAHY, Senior Circuit Judge, and MacKINNON, Circuit Judge.
 BAZELON, Chief Judge:
 
 
 1
 This appeal injects us back into the midst of a long and sometimes acrimonious imbroglio over the proposed construction of a bridge across the Potomac River from Virginia into the District of Columbia. In an earlier appeal we held that the so-called Three Sisters Bridge could not be built except in compliance with the hearing, environmental protection, safety, and other provisions of federal law applicable to the construction of federally-assisted highway projects.[1] That question, accordingly, is no longer open. We must now decide whether the Department of Transportation did, in fact and in law, heed the applicable federal statutes when it decided that the bridge should be built. On the basis of an extended factual inquiry, the District Court concluded that the Department had failed to comply with some of the provisions.[2] We affirm that part of the District Court's judgment. As to the provisions with which the District Court found compliance, however, we have concluded that the statutory requirements were not satisfied, and the case will therefore be remanded to afford the Secretary an opportunity to make appropriate determinations as required by the statute.
 
 
 2
 The factual background of this dispute has been described in detail in our earlier opinion[3] and in the opinion of the District Court.[4] Briefly stated, the controversy concerns a projected bridge between the Georgetown waterfront in the District of Columbia and Spout Run in Virginia. The bridge, which would be part of the Interstate Highway System and would be built largely with federal funds, would traverse the Three Sisters Islands, would "affect the Georgetown Historic District,"[5] and would use some parkland. The precise amount of harm to parkland and historic sites has not yet been determined, however, since the planning of the bridge -including the approaches and access roads-is not yet finalized.[6] A source of continuous controversy since its conception, the proposed bridge was deleted from the Interstate Highway System in January, 1969, when the National Capital Planning Commission, the official planning body for the District, adopted "a comprehensive transportation plan which did not include the Three Sisters Bridge."[7] The bridge was redesignated part of the Interstate System six months later after Representative Natcher, Chairman of the Subcommittee on the District of Columbia of the House Appropriations Committee, indicated unmistakably that money for construction of the District's subway system would be withheld if the bridge plan were not revived.[8] To satisfy the Chairman, it was necessary, first, for the District of Columbia City Council to reverse its earlier position,[9] and vote to approve the project. On August 9, 1969, the District government so voted, with the swing members loudly protesting that they would not have changed their votes but for the pressures exerted by Representative Natcher.[10] The second prerequisite of redesignation was a decision by Transportation Secretary Volpe that the project should go ahead as part of the Interstate System. He announced that decision on August 12, 1969, and the project sprang full-blown back to life on the following day.
 
 
 3
 On April 6, 1970, we held that the hearing and planning requirements of title 23 of the United States Code were fully applicable to this project notwithstanding a 1968 Act directing that construction of the bridge begin not later than thirty days after the Act's passage.[11] We remanded the case to the trial court for an evidentiary hearing to determine whether the Secretary had complied with the pertinent provisions in concluding that the project should be revived. The case is before us on appeal and cross-appeal from the trial court's decision.
 
 I.
 
 4
 Given our earlier decision, the Secretary's approval of the bridge must be predicated on compliance with a number of statutory provisions. Plaintiffs[12] challenged with two lines of argument the District Court's finding of compliance. First, they maintain that the Secretary's determinations under the statute were tainted by his consideration of extraneous factors unrelated to the merits of the questions presented. They allege-and argue, moreover, that the District Court specifically found-that pressures exerted by Representative Natcher contributed to the decision to approve the bridge. Second, they argue that quite apart from the allegations of pressure, the record and applicable legal principles do not support a finding of compliance. The two strands of argument are plainly related, in plaintiffs' view, since the alleged shortcomings under each statutory provision illustrate and lend substance to the argument that the rational, impartial evaluation of the project envisioned by the statute was impermissibly distorted by extraneous pressures. We consider first plaintiffs' argument that the determinations could not stand even if there were no issue of extraneous pressure.
 
 A. Requirements of Sec. 138
 
 5
 If a proposed federally-assisted highway project would encroach on parkland or historic sites, the Secretary of Transportation must determine before construction can begin that there is "no feasible and prudent alternative to the use of such land," and, assuming such a finding, that the "program includes all possible planning to minimize harm to such park * * * or historic site."12a The District Court concluded that Secretary Volpe had complied with each of these requirements.
 
 
 6
 In defending the Secretary's action, the government can hardly maintain that there was no "feasible" alternative to construction of the Three Sisters Bridge. This exemption applies, as the Supreme Court indicated in Citizens to Preserve Overton Park, Inc. v. Volpe, only if the Secretary finds that "as a matter of sound engineering it would not be feasible to build the highway along any other route."[13] It could still be argued, however, that the Secretary rejected each of the feasible alternatives because none of them was "prudent." In construing this second exemption, the Supreme Court pointed out that
 
 
 7
 the very existence of the statute indicates that protection of parkland was to be given paramount importance. The few green havens that are public parks were not to be lost unless there were truly unusual factors present in a particular case or the cost or community disruption resulting from alternative routes reached extraordinary magnitudes. If the statutes are to have any meaning, the Secretary cannot approve the destruction of parkland unless he finds that alternative routes present unique problems.[14]
 
 
 8
 Our review of the Secretary's determination is hindered not only by the lack of any formal findings, but also by the absence of a "meaningful administrative record within the Department of Transportation evidencing the fact that proper consideration has been given to the requirements of this section."[15] However regrettable, the failure to provide explicit findings indicating why all possible alternatives to the bridge would be unfeasible or imprudent does not, in itself, invalidate the Secretary's action.[16] But the complete non-existence of any contemporaneous administrative record is more serious. Absent a record, judicial review of the Secretary's action can be little more than a formality[17] unless the District Court takes the disfavored step of requiring the Secretary to testify as to the basis of his decision.[18] And even the Secretary's "post hoc rationalizations,"[19] filtered through a factfinder's understandable reluctance to disbelieve the testimony of a Cabinet officer, will rarely provide an effective basis for review. Furthermore, it is hard to see how, without the aid of any record, the Secretary could satisfactorily make the determinations required by statute. The absence of a record, in other words, simultaneously obfuscates the process of review and signals sharply the need for careful scrutiny.
 
 
 9
 Secretary Volpe's testimony before the District Court did little to allay the doubts generated by the lack of an administrative record. Indeed, his testimony-on occasion uncertain and inconsistent with the testimony of others[20] -itself gives rise to at least a serious question whether he considered all possible alternatives to the plan eventually approved. It is clear, moreover, that the Department of Transportation failed to apply its own procedures generally applicable to determinations under Sec. 138.[21] That failure is especially disquieting since the procedures at issue were designed specifically to insure that determinations under Sec. 138 would be made, in the Secretary's words, only after "a great amount of real independent and genuine review [by] people who were not particularly highway oriented . . . ."[22]
 
 
 10
 Furthermore, an apparent misconception about our earlier decision may itself have distorted the Secretary's determination under Sec. 138. The government has read our earlier opinion to mean that a bridge must be built, albeit in accordance with the provisions of title 23, somewhere in the vicinity of the proposed Three Sisters Bridge. Congress did direct, as we previously indicated, "that a bridge be built over the Potomac following the general configurations laid out in the cost estimates."[23] Viewed in context, however, the statement does not convey the meaning which the government suggests, for we held that "nothing in the statute indicates that Congress intended the Bridge to be built contrary to its own laws."[24] If the bridge cannot be built consistently with applicable law, then plainly it must not be built. It is not inconceivable, for example, that the Secretary might determine that present and foreseeable traffic needs can be handled (perhaps by expansion of existing bridges) without construction of an additional river crossing. In that case, an entirely prudent and feasible alternative to the Three Sisters Bridge might be no bridge at all,[25] and its construction would violate Sec. 138. Thus, the Secretary may have disregarded one possible prudent and feasible alternative to the use of parkland and historic sites on the mistaken assumption that that alternative was foreclosed by our earlier decision.[26]
 
 
 11
 While these difficulties give rise to at least a substantial inference that the Secretary failed to comply with Sec. 138, that inference ripens into certainty when one turns to the second determination required by Sec. 138. Before the project can begin, the Secretary must determine that all possible planning has been done to minimize harm to the affected parkland and historic sites. Yet the District Court found, and the Secretary apparently concedes, that final design of the ramps and interchanges is not yet complete. Thus, when Secretary Volpe purportedly complied with Sec. 138 in August, 1969, he could at best have been "satisfied * * * that the designs which would be developed based on the preliminary plans would result in a minimum taking of parkland,"[27] but he could not have concluded that the necessary planning had already been done. The District Court reasoned that the expectation of future planning could satisfy Sec. 138. But that reasoning seems inconsistent with the Supreme Court's subsequent admonition that Sec. 138 can be obeyed "only if there has been 'all possible planning to minimize harm' to the park."[28] Moreover, the District Court approved the Sec. 138 determination on the basis of the Secretary's testimony that a "minimum of parkland would be taken" for the ramps and interchanges.[29] More is at stake, however, than the "minimum taking" of parkland. Section 138 speaks in terms of minimizing "harm" to parkland and historic sites, and the evaluation of harm requires a far more subtle calculation than merely totaling the number of acres to be asphalted. For example, the location of the affected acres in relation to the remainder of the parkland may be a more important determination, from the standpoint of harm to the park, than determining the number of affected acres. The Secretary has not yet determined which acres will be taken. In addition, a project which respects a park's territorial integrity may still, by means of noise, air pollution and general unsightliness, dissipate its aesthetic value, crush its wildlife, defoliate its vegetation, and "take" it in every practical sense.[30]
 
 
 12
 Absent a finalized plan for the bridge, it is hard to see how the Department could make a meaningful evaluation of "harm." Furthermore, Secretary Volpe did not consult with other planning agencies to coordinate efforts to minimize harm to the park and historic sites.[31] He also made no studies of potential air pollution damage to the park. His approval of the project under Sec. 138 was, in short, entirely premature, and we hold that he must make new determinations consistent with the statutory standards.
 
 B. Requirements of Sec. 134
 
 13
 The Secretary cannot approve federally-assisted highway projects in urban areas unless he finds "that such projects are based on a continuing comprehensive transportation planning process" carried out in conformance with Congress's objective of promoting the development of transportation systems.[32] The Secretary reasoned, and the District Court approved his reasoning, that the bridge project was consistent with such a planning process since the bridge had been approved by, and was subject to the continuing scrutiny of, the Transportation Planning Board (TPB) of the Metropolitan Washington Council of Governments.[33] Plaintiffs, on the other hand, emphatically deny compliance with Sec. 134 on the grounds that the "comprehensive transportation plan promulgated by the National Capital Planning Commission (NCPC) in December 1968, specifically 'rejects the Three Sisters Bridge . . as being both unnecessary and undesirable."'[34] While plaintiffs point out that NCPC is the official planning agency for the District of Columbia and that it alone has prepared a comprehensive transportation plan, the government contends that the Council of Governments, unlike the NCPC, is a regional organization which must consider the interests of the surrounding jurisdictions.
 
 
 14
 We are unwilling to resolve this dispute by some abstract balancing of NCPC disapproval against TPB approval. That approach would, we are convinced, entirely miss the point of Sec. 134. That section does not suggest that the Secretary has satisfied his statutory responsibility as soon as he has found a single plan which incorporates a proposed highway project. Nor can it reasonably be interpreted to mean that the project must be approved by every plan applicable to the affected region. The section speaks, after all, in terms of "planning," not "plans," and it is not our function to decide that one plan has merit while another does not. Rather, it is for the Secretary to determine whether a particular project will be consistent with sound transportation planning for the region.
 
 
 15
 Decisionmaking responsibility under Sec. 134 has been delegated by Secretary Volpe to the Public Roads Division Engineer, Mr. Hall. Mr. Hall disregarded NCPC disapproval of the project because he believed that "TPB [was] the primary agency to which he should look in making his finding."[35] The District Court approved his finding on that same reasoning. But that reasoning cannot do service for the more sophisticated determination required by the statute. In making his "mental" finding[36] of compliance with Sec. 134, Mr. Hall apparently did no more than adopt TPB's conclusion that the project was "consistent with comprehensive planning" for the region.[37] Yet that is precisely the determination that the Department of Transportation, taking into account the recommendations of local plans, must make. The statute plainly does not permit the Department to delegate its statutory responsibility to a local planning agency. On remand, the Department must reevaluate the project in light of the purposes of Sec. 134.
 
 
 16
 Since the determination was not grounded on a correct understanding of the statute's requirements, we need not now decide whether the substantive result, if reached pursuant to appropriate procedures, would itself be supportable. But to aid the Department's redetermination under Sec. 134, we should make clear our misgivings about the result and our doubts that it could be upheld on the present record even under the constrained standard of substantive review.[38] TPB approved the bridge project in 1967, two years before Mr. Hall made his finding under Sec. 134.[39] No comprehensive transportation plan had been adopted at that time, either by TPB or any other planning agency. NCPC, which did not formulate its plan until December, 1968, was on record at the time of TPB's action in 1967 as approving the bridge project. TPB approved the project not under Sec. 134, but under the Demonstration Cities and Metropolitan Development Act of 1966.[40] NCPC, on the other hand, developed a transportation plan in response to President Johnson's call for the development of a "comprehensive plan for a D.C. highway system" which would permit the Department of Transportation to determine whether the Three Sisters Bridge and other projects would be "appropriate links" in such a plan;[41] it then rejected the bridge proposal. And even if TPB approval were not-at least on its face-stale, inapposite, and unsupported by any underlying, comprehensive plan, we would still have difficulty accepting the Department's finding without some explanation of how the Sec. 134 determination could be made before plans for the bridge are finalized.[42] Nothing in the record suggests that TPB approval- whatever its other apparent shortcomings-embraced each conceivable design that might eventually be adopted.
 
 C. Requirements of Sec. 109(a)
 
 17
 The Secretary's approval of plans for a federally-assisted highway project is conditioned on a determination that the proposed facility will "adequately meet the existing and probable future traffic needs and conditions in a manner conducive to safety, durability, and economy of maintenance."[43] The District Court held that planning for the Three Sisters Bridge had not "proceeded to a sufficient degree for the responsible officials to determine that the planned facility is structurally feasible."[44] Accordingly, the Court enjoined construction of the bridge until the planning had advanced to a stage where structural feasibility was assured. We find the District Court's judgment consistent with the statute and the facts presented, and it is therefore affirmed.
 
 
 18
 Plaintiffs also argue, however, that the project was approved before the Secretary could be certain, first, that river bed conditions would support the bridge, and second, that no safety hazard would arise from the increase in air pollution attributable to traffic on the bridge. Again, we are unable to accept the District Court's disposition. With regard to river bed conditions, the District Court noted that
 
 
 19
 [b]efore the construction of a bridge, it is necessary to make extensive investigations of subsurface conditions to determine if they are sufficient to support the foundations for the bridge piers. This is done primarily by means of borings. * * * At the time Mr. Hall approved the plans, specifications and estimates for the pier construction, these borings had not been completed, and subsequently problems developed so that the plans for the project had to be modified.[45]
 
 
 20
 Called to testify before the District Court, Mr. Hall still could not be certain "that the present planned foundation is adequate."[46] Nevertheless, the District Court found compliance with Sec. 109(a) because of Mr. Hall's testimony "that there is no question that the piers can be built to support the bridge as presently planned."[47] The Department of Transportation is obviously unwilling to construct a bridge known to be unsafe, and during the course of construction the Department would surely verify the suitability of the river bed conditions. But Sec. 109(a) requires not only that the bridge be safe, but also-and no less important-that its safety be ascertained before the Secretary approves the project. That requirement minimizes the safety hazards and at the same time insures that public funds will not be squandered on a demonstrably unsafe proposal. Where planning reveals defects in design or location, those defects can be corrected on paper rather than on steel and concrete.
 
 
 21
 The District Court's findings are not entirely clear as to whether questions about the safety of river bed conditions could be more fully resolved before construction resumes. We hold that if such questions do exist, the Secretary must take steps to resolve them to the fullest practical extent before granting approval of the project under Sec. 109(a).
 
 
 22
 Plaintiffs' second contention under Sec. 109(a) concerns the dangers of air pollution. The District Court concluded that evidence of a potential air pollution hazard was insufficient to support a finding "that the defendants are required to undertake a study of such [air pollution] effects."[48] We can find no basis in the statute's language or purpose for the conclusion that certain hazards are, as a matter of law, immaterial to the Secretary's evaluation of a project's safety. The District Court would surely agree that Congress did not intend to permit construction of a bridge in a situation, however rare, where air pollution would be a significant threat to safety. It does not follow, of course, that air pollution will be a significant hazard in all-or even any-highway projects. And the District Court apparently concluded that no extraordinary dangers are likely to arise from the Three Sisters Bridge. Still, the gathering and evaluation of evidence on potential pollution hazards is the responsibility of the Secretary of Transportation, and he undertook no study of the problem. His staff has far greater resources and expertise on this matter than the District Court, and it is possible that a study by the Department would reveal significant dangers which had escaped the attention of the District Court. Inquiry into this issue cannot be foreclosed merely because the District Court found no significant evidence of air pollution hazards. That determination must be made in the first instance by the Secretary of Transportation.[49]
 
 D. Requirements of Sec. 128
 
 23
 Section 128[50] requires that public hearings be held before construction can begin. In the earlier appeal we specifically held applicable to the Three Sisters Bridge project not only Sec. 128, but also the Department of Transportation's implementing regulations.[51] Those regulations require, in certain specified situations, a hearing on project location and a hearing on project design. After exhaustive consideration of the record, the District Court concluded that the Department had not complied with the design hearing requirement, but that the location hearing requirement had been satisfied.
 
 
 24
 While the government did not admit error with regard to the design hearing, it nevertheless chose to hold the necessary hearing in a commendable effort to reduce the number of issues outstanding. Since the question has now been mooted, we express no opinion on the District Court's conclusion.[52] As for the location hearing, the District Court reasoned that a hearing held in 1964 satisfied the requirement, even though different proposals were the subject of that hearing,[53] since the change in plan was "so insubstantial that the public would not be affected any differently than by the original proposal which formed the basis for the first hearing . . ."[54] We have no quarrel with the District Court's reasoning, but on the present record we are unable to accept its application to this case. Of the proposals submitted at the 1964 hearing, the one most similar to current plans for the bridge was still off by 1500 feet on the District of Columbia shore and 950 feet on the Virginia shore.[55] Ramps and interchanges as well as the routing of traffic have also been substantially redesigned. Nevertheless, the District Court could not "conceive how many members of the public would be affected differently by the present location than by one of the three" considered in 1964.[56] It is entirely conceivable to us that the differences in the plans would, in fact, have a substantially different impact on persons on both shores. We would be reluctant, of course, to disturb the District Court's finding of fact on this point if it were clear that a finding had actually been made. But there is no indication in the record before us that the District Court gathered evidence on this issue, and we have nothing to support the conclusion but the conclusion itself. Moreover, in making the determinations required by this opinion, the Secretary may conclude that current plans must be abandoned in favor of a new location. Accordingly, we remand this issue to the District Court for clarification of the factual basis of its conclusion, and for reconsideration in light of any further location changes the Secretary of Transportation may order.[57]
 
 E. Requirements of Sec. 317
 
 25
 If the Secretary determines that lands owned by the United States are needed for a proposed highway project, he mustfile with the Secretary of the Department supervising the administration of such lands or interests in lands a map showing the portion of such lands or interests in land which it is desired to appropriate.[58]
 
 
 26
 After concluding that the bridge project would use federal parklands under the jurisdiction of the Interior Department's National Park Service, and after noting defendant's admission that a map had not been filed, the District Court still found "compliance with the spirit, if not the letter, of Sec. 317."[59] The court based its findings on the consultation between the Transportation and Interior Departments with regard to this project, and on the issuance by the latter of permits for the use of the parkland.
 
 
 27
 We agree with the District Court that the failure to supply a map should not be an absolute bar to the construction of the bridge if the purposes of Sec. 317 have in fact been realized. That section is designed, as the District Court acknowledged, to
 
 
 28
 require the Secretary of Transportation to give notice to the Secretary of the Department having control of the land, and provide a means by which the latter may protect any governmental interest in use of the property for purposes other than highway construction.[60]
 
 
 29
 We need not decide whether the District Court erred in finding compliance with the spirit of Sec. 317. In view of our conclusion that the case must be remanded for new determinations, it would not appear to be a significant burden on the Department to remove all doubts under this section by filing the appropriate map.[61]
 
 F. Provisions Other Than Title 23
 
 30
 At the hearing below, the District Court barred plaintiffs from presenting evidence on a number of allegations in their complaint because those allegations related to statutory provisions which the District Court found inapplicable to the Three Sisters Bridge project. Thus, the Court concluded that the project was exempted by Congress from compliance with certain provisions of the federal Code, as well as provisions of the District of Columbia Code.[62]
 
 
 31
 In 1968 we held in D.C. Federation of Civic Associations, Inc. v. Airis[63] that this project must comply with pertinent requirements of the D.C.Code. Later that year, Congress directed, in Section 23 of the Federal-Aid Highway Act, that
 
 
 32
 [n]otwithstanding any other provision of law or any court decision or administrative action to the contrary . . . construction [of the Three Sisters Bridge] shall be undertaken as soon as possible . . . and shall be carried out in accordance with all applicable provisions of Title 23 of the United States Code.[64]
 
 
 33
 The District Court then held explicitly that the Three Sisters Bridge had been exempted from all of the pre-construction provisions of title 23, and implicitly that the bridge had been exempted from the comparable provisions of the D.C. Code.[65] On appeal from that decision, we held that the bridge must comply with all applicable provisions of title 23. Our opinion did not indicate flatly, however, that the project must also comply with non-title 23 provisions. In view of the District Court's conclusion that compliance with nontitle 23 provisions is not required, we must now resolve the ambiguity arguably left by our earlier opinion.
 
 
 34
 The applicability of these provisions was not squarely faced in the parties' briefs,[66] nor was it discussed at oral argument. While our earlier opinion did make one specific reference to the issue, the parties now draw opposite conclusions from that reference. Discussing section 23's directive that the bridge be built "notwithstanding any * * * court decision * * * to the contrary," we pointed out that
 
 
 35
 [p]resumably the "court decision" language refers to our decision in Airis [holding D.C.Code provisions applicable to the Three Sisters Bridge], but the reference is mistaken since that decision was not "to the contrary."[67]
 
 
 36
 Under these circumstances, we are reluctant to resolve the dispute without providing the parties an opportunity to discuss the question on the merits. Accordingly, we defer judgment on this issue to permit the parties to file, within twenty days from the date of this opinion, memoranda dealing with the question.
 
 II
 
 37
 As Part I of this opinion makes clear, the Secretary's determinations failed to comply with a significant number of title 23 provisions applicable to the Three Sisters Bridge. Taken as a whole, the defects in the Secretary's determinations-in particular, his effort to make the determinations before plans for the bridge were complete-lend color to plaintiffs' contention that the repeated and public threats by a few Congressional voices did have an impact on the Secretary's decisions. As the District Court pointed out,
 
 
 38
 [t]here is no question that the evidence indicates that strong political pressure was applied by certain members of Congress in order to secure approval of the bridge project. Congressman Natcher stated publicly and made no secret of the fact that he would do everything that he could to withhold Congressional appropriations for the District of Columbia rapid transit system, the need for which is universally recognized in the Washington metropolitan area, until the District complied with the 1968 Act.[68]
 
 
 39
 When funds for the subway were, in fact, blocked, Representative Natcher
 
 
 40
 made his position perfectly clear, stating that "as soon as the freeway project gets under way beyond recall then we will come back to the House and recommend that construction funds for rapid transit be approved."[69]
 
 
 41
 The author of this opinion is convinced that the impact of this pressure is sufficient, standing alone, to invalidate the Secretary's action. Even if the Secretary had taken every formal step required by every applicable statutory provision, reversal would be required, in my opinion, because extraneous pressure intruded into the calculus of considerations on which the Secretary's decision was based. Judge Fahy, on the other hand, has concluded that since critical determinations cannot stand irrespective of the allegations of pressure, he finds it unnecessary to decide the case on this independent ground.
 
 
 42
 In my view, the District Court clearly and unambiguously found as a fact that the pressure exerted by Representative Natcher and others did have an impact on Secretary Volpe's decision to approve the bridge. The Court pointed out that
 
 
 43
 [t]he statement issued by the Secretary at the time he directed the Federal Highway Administrator to restore the bridge to the Interstate System indicates that the pressure on the rapid transit funds was a consideration at that time.[70]
 
 
 44
 The Court also found, on the basis of the Secretary's contemporaneous statements and his testimony before the Court, that
 
 
 45
 There is no question that the pressure regarding the rapid transit appropriations was given some consideration at the time of the approval of the project in August, 1969.[71]
 
 
 46
 The Secretary's testimony indicated, as the court below pointed out, that "his decision was based on the merits of the project and not solely on the extraneous political pressures."[72]
 
 
 47
 Notwithstanding these findings of fact, the Court determined as a matter of law that since the Secretary was not acting in a judicial or quasi-judicial capacity, his decision would be invalid only if based solely on these extraneous considerations.[73] I cannot accept that formulation of the applicable legal principle. While Judge Fahy is not entirely convinced that the District Court ultimately found as a fact that the extraneous pressure had influenced the Secretary's decision-a point which is for me clear-he has authorized me to note his concurrence in my discussion of the controlling principle of law: namely, that the decision would be invalid if based in whole or in part on the pressures emanating from Representative Natcher. Judge Fahy agrees, and we therefore hold, that on remand the Secretary must make new determinations based strictly on the merits and completely without regard to any considerations not made relevant by Congress in the applicable statutes.
 
 
 48
 The District Court was surely correct in concluding that the Secretary's action was not judicial or quasi-judicial,[74] and for that reason we agree that much of the doctrine cited by plaintiffs is inapposite.[75] If he had been acting in such a capacity, plaintiffs could have forcefully argued that the decision was invalid because of the decisionmaker's bias,[76] or because he had received ex parte communications.[77] Well-established principles could have been invoked to support these arguments, and plaintiffs might have prevailed even without showing that the pressure had actually influenced the Secretary's decision.[78] With regard to judicial decisionmaking, whether by court or agency, the appearance of bias or pressure may be no less objectionable than the reality. But since the Secretary's action was not judicial, that rationale has no application here.
 
 
 49
 If, on the other hand, the Secretary's action had been purely legislative, we might have agreed with the District Court that his decision could stand in spite of a finding that he had considered extraneous pressures. Beginning with Fletcher v. Peck,[79] the Supreme Court has maintained that a statute cannot be invalidated merely because the legislature's action was motivated by impermissible considerations (except, perhaps, in special circumstances not applicable here[80]). Indeed, that very principle requires us to reject plaintiffs' argument that the approval of the bridge by the District of Columbia City Council was in some sense invalid. We do not sit in judgment of the motives of the District's legislative body, nor do we have authority to review its decisions. The City Council's action constituted, in our view, the approval of the project required by statute.[81]
 
 
 50
 Thus, the underlying problem cannot be illuminated by a simplistic effort to force the Secretary's action into a purely judicial or purely legislative mold. His decision was not "judicial" in that he was not required to base it solely on a formal record established at a public hearing. At the same time, it was not purely "legislative" since Congress had already established the boundaries within which his discretion could operate. But even though his action fell between these two conceptual extremes, it is still governed by principles that we had thought elementary and beyond dispute. If, in the course of reaching his decision, Secretary Volpe took into account "considerations that Congress could not have intended to make relevant,"[82] his action proceeded from an erroneous premise[83] and his decision cannot stand.[84] The error would be more flagrant, of course, if the Secretary had based his decision solely on the pressures generated by Representative Natcher. But it should be clear that his action would not be immunized merely because he also considered some relevant factors.[85]
 
 
 51
 It is plainly not our function to establish the parameters of relevance. Congress has carried out that task in its delegation of authority to the Secretary of Transportation. Nor are we charged with the power to decide where or when bridges should be built. That responsibility has been entrusted by Congress to, among others, the Secretary, who has the expertise and information to make a decision pursuant to the statutory standards. So long as the Secretary applies his expertise to considerations Congress intended to make relevant, he acts within his discretion and our role as a reviewing court is constrained. We do not hold, in other words that the bridge can never be built. Nor do we know or mean to suggest that the information now available to the Secretary is necessarily insufficient to justify construction of the bridge. We hold only that the Secretary must reach his decision strictly on the merits and in the manner prescribed by statute, without reference to irrelevant or extraneous considerations.
 
 
 52
 For the purposes of the foregoing discussion, we have assumed that pressures exerted by Congressional advocates of the bridge are irrelevant to the merits of the questions presented to Secretary Volpe. It does not seem possible to make even a colorable argument of relevance except with regard to Sec. 138. But it might be argued that the potential loss of the subway was the type of "unique problem" and cost of "extraordinary magnitude"[86] that the Secretary could properly consider in deciding, pursuant to Sec. 138, that there were no purdent alternatives to the use of parkland for the bridge. The Secretary plainly understood that the price of abandoning, modifying, or even delaying construction of the bridge was the loss of appropriations for the District's subway. He undoubtedly viewed the prospect of that loss with understandable alarm, and may have concluded that the destruction of parkland was inescapable and appropriate in the face of Representative Natcher's clear and enforceable threat. We cannot agree, however, that a determination grounded on that reasoning would satisfy the requirements of Sec. 138.
 
 
 53
 Neither the section's legislative history nor the Supreme Court's decision in Overton Park indicates clearly whether or not this sort of consideration should be deemed relevant. We are persuaded, however, that holding these pressures relevant would effectively emasculate the statutory scheme. The purpose of Sec. 138, in our view, was to preserve parkland by directing the Secretary to reject its use except in the most unusual situation where no alternative would be available. The "unusual situation" posited here is entirely the product of the action of a small group of men with strongly-held views on the desirability of the bridge, who, it may be assumed, are acting with the interests of the public at heart. They may well be correct in concluding that a new bridge is needed and that no alternative location is available. But no matter how sound their reasoning nor how lofty their motives, they cannot usurp the function vested by Act of Congress in the Secretary of Transportation. Until the statute is amended or repealed by another Act of Congress, the Secretary must himself decide, bearing in mind the statute's mandate for the preservation of parkland, whether a prudent alternative is available. Congress could not have contemplated that an alternative would be "imprudent" merely because persons who are convinced that parkland should be used have the power to decree that all alternatives to the use of that parkland shall henceforth be agonizing. Our interpretation of Sec. 138 is essential if the Secretary is to be insulated from extraneous pressures that have no relevance to his assigned statutory task.
 
 
 54
 To avoid any misconceptions about the nature of our holding, we emphasize that we have not found-nor, for that matter, have we sought-any suggestion of impropriety or illegality in the actions of Representative Natcher and others who strongly advocate the bridge. They are surely entitled to their own views on the need for the Three Sisters Bridge, and we indicate no opinion on their authority to exert pressure on Secretary Volpe. Nor do we mean to suggest that Secretary Volpe acted in bad faith or in deliberate disregard of his statutory responsibilities. He was placed, through the action of others, in an extremely treacherous position. Our holding is designed, if not to extricate him from that position, at least to enhance his ability to obey the statutory command notwithstanding the difficult position in which he was placed.
 
 III.
 
 55
 We conclude that the case should be remanded to the District Court with directions that it return the case to the Secretary[87] for him to perform his statutory function in accordance with this opinion. It seems clear that even though formal administrative findings are not required by statute, the Secretary could best serve the interests of the parties as well as the reviewing court by establishing a full-scale administrative record which might dispel any doubts about the true basis of his action.[88] Accordingly, the District Court is directed to enjoin construction of the bridge until the defendants have complied with the applicable statutory provisions as set forth in our opinion.
 
 
 56
 Reversed and remanded.
 
 
 57
 MacKINNON, Circuit Judge (concurring in part and dissenting in part):
 
 
 58
 From time immemorial the public interest has suffered from various types of bottlenecks which injure the public in many ways. This case arises out of governmental efforts which seek to improve the highway transportation facilities of the Washington Metropolitan area by removing a number of highway bottlenecks. One of these is the traffic bottleneck in the vicinity of, and across the river from, Georgetown in Northwest Washington. There the increasing congestion on parkland highways, an antiquated street system and historic road patterns which are additionally confined within the adverse topographical features of the beginnings of the Potomac Gorge, combine with the necessity of bridging the Potomac River to cause great inconvenience to those attempting to enter or leave the District of Columbia by means of the existing streets and highways. The result is great inconvenience to thousands of highway users entering and leaving the capital and a substantial lengthening of many workers' day.
 
 
 59
 The governmental authorities responsible for dealing with this situation concluded that it is necessary to erect the Three Sisters Bridge across the Potomac River as one essential part of the overall highway improvement program proposed for the entire metropolitan area. The erection of this bridge is here opposed by a citizens group of the District of Columbia which does not seriously attack the basic merits of the overall program to improve highway traffic congestion but instead ground their opposition on an alleged failure to comply with certain procedural requirements imposed by statute which are applicable to the planning and construction of the project. In such matters, under our form of government with its separation of powers, the function of policy making is assigned to the Legislative and Executive Branches. Congress enacts the basic laws and these are carried out by (1) the Executive Department functioning principally through the Department of Transportation, headed by the Secretary of Transportation, a member of the President's Cabinet, Mr. Volpe, though other federal departments may perform isolated functions; and (2) by the District of Columbia acting through its Highway Department.
 
 
 60
 It should also be noted that the Constitution vests Congress with complete control over the entire area of the District of Columbia for all governmental purposes and insofar as legislation is concerned vests it with the combined powers of the federal and state governments. U.S. Constitution, art. I, Sec. 8; Kendall v. United States, 12 Pet. 524, 618, 9 L.Ed. 1181 (1838); Stoutenburgh v. Hennick, 129 U.S. 141, 147, 9 S.Ct. 256, 32 L.Ed. 637 (1889); Shoemaker v. United States, 147 U.S. 282, 300, 13 S.Ct. 361, 37 L.Ed. 170 (1893); Atlantic Cleaners and Dyers v. United States, 286 U.S. 427, 434-435, 52 S. Ct. 607, 76 L.Ed. 1204 (1932); O'Donoghue v. United States, 289 U.S. 516, 539, 53 S.Ct. 740, 77 L.Ed. 1356 (1933). The Constitution thus imposes a precise duty upon the members of Congress to look after the needs of the District of Columbia in addition to those of their individual district constituents. Members of Congress are also charged with guarding all the interests of the entire nation in the District of Columbia as the seat of our national government. Pursuant to this assignment of responsibilities, Congress and its members have taken cognizance of the need for transportation facilities in the District of Columbia and the surrounding metropolitan area. To meet the area's anticipated transportation needs it has authorized the appropriation of federal funds for the construction of a metropolitan subway system and has also authorized and directed that substantial additions be constructed to the thru-highways in the area. These additions include the erection of the Three Sisters Bridge.[1] In this connection it was the decision of Congress that the subway construction and the additional highways (including the Three Sisters Bridge) would be built contemporaneously. This conclusion follows from the facts of the contemporaneous appropriations and the express congressional direction that work on the Three Sisters Bridge begin within thirty days after the congressional enactment (82 Stat. 815).
 
 
 61
 The remainder of this opinion deals with the very extraordinary majority opinion-extraordinary in that it effectively sets aside for one alleged reason or another every finding of the trial court that the Government had in any way complied with the statutes in question. In its own language:
 
 
 62
 As to the provisions with which the District Court found compliance, however, we have concluded that the statutory requirements were not satisfied * * *.
 
 
 63
 Majority opinion, page 1235. In this terse manner the extensive findings of the trial court are effectively negated. The discussion of the application of the separate statutes (Title 23, U.S.Code) which follows fully demonstrates the wide gulf between the majority and the practical trial judge who heard all the witnesses in an extensive 12-day hearing, received 1,025 pages of depositions and then thoroughly documented his findings in an opinion covering 40 printed pages. D.C. Federation of Civic Associations v. Volpe, 316 F.Supp. 754 (D.D.C.1970).
 
 
 64
 Section 138-Feasible and Prudent Alternatives and Planning
 
 
 65
 The majority opinion sets aside the determination of the trial court that the Secretary had complied with the requirements of section 138[2] largely because of an absence of formal findings and an administrative record in the Department of Transportation. The majority opinion asserts that all possible planning to minimize harm to the affected parkland and historic sites[3] could not have been carried out because the final design of the ramps and interchanges had not been completed when the Secretary approved the project. However, the lack of findings and the normal departmental administrative record is fully and satisfactorily explained by the fact that the Secretary personally made the necessary decisions and the Department file thus does not include the usual inter-office memoranda reflecting action by subordinates which is a feature of those projects on which the Secretary does not personally exercise his statutory responsibility. After all, the statute places the duty upon the Secretary to make such determinations and his decision should not be set aside because of the absence of documents which are not necessary or normal when he personally exercises that responsibility. This Secretary of Transportation is not a figurehead. He has had extensive prior experience in highway programs. His background and record indicate that he is personally capable of making not only the ultimate decision on the bridge project but also many of the underlying minor, but basic, decisions.[4]
 
 
 66
 Further, I would not conclude that the Secretary failed to indulge in all possible planning to minimize harm to the park because his consideration of the amount of land to be taken by the ramps was based on the preliminary plans for the ramps. In this respect the opinion of the trial court states:
 
 
 67
 Secretary Volpe testified that he based his determination on the preliminary planning for the ramps and interchanges which had been done at that time. Although he conceded that the final design of the ramps was not complete, he pointed out that there were very limited alternatives available. He stated that before he approved the bridge project, he was satisfied, and the Department of Interior, which had jurisdiction over the parklands, was satisfied, that the designs which would be developed based on the preliminary plans would result in a minimum taking of parkland. [Emphasis added.]
 
 
 68
 D.C. Federation of Civic Associations v. Volpe, supra, 316 F.Supp. at 774-775. I construe this statement of the trial court as a finding that the Secretary took into consideration the amount of parkland that might be required under all the limited alternatives for the ramps and interchanges. Thus, the final selection of any ramp, etc., design would not present any problem that the Secretary has not already considered.
 
 
 69
 As to the suggestion of the majority that the use of the word "harm" in the statute confers authority upon the courts in this case, where only Government land is involved, to pass upon the "subtle calculations" inherent in determining the "aesthetic value" of this bridge, it is my view that Congress had more practical considerations in mind and did not thereby direct the rejection of projects which while they may be "pleasing" to the eye might by some personal standards be considered not to be "beautiful." See Webster's New International Dictionary, 2d ed.
 
 
 70
 The majority opinion further states that the Government can hardly maintain that there was no "feasible" alternative to the construction of the Three Sisters Bridge because this exemption under Overton Park[5] only applies if the Secretary finds that as a matter of "sound engineering" it would not be feasible to build the highway along any other route. To my mind this argument is not foreclosed to the Government in the least. The majority's comment may have been falsely premised on a belief that sound engineering referred only to structural features, but there is much more to highway engineering than the stability of the structural features that may be constructed. Certainly the location of present highways and bridges in the Washington area when combined with various topographical features, existing traffic flow patterns, and the fact that one objective of the Three Sisters Bridge project was doubtlessly intended to alleviate some of the traffic congestion presently existing on the highways within the parklands on both sides of the river in the vicinity of the Three Sisters Bridge, might compel the conclusion that as a matter of sound highway engineering the only feasible project that would correct the congestion would be to erect a bridge in the vicinity of the Three Sisters Islands.[6] I would thus not rule out the possibility that sound highway engineering would practically dictate a bridge at that location and that it would not be feasible to correct that traffic congestion by the construction or expansion of a bridge at any other location. The controlling engineering principles when applied to the facts here present may not produce such a conclusion but there is nothing in this record to indicate that such conclusion could not properly be dictated by the application of sound highway engineering principles.
 
 
 71
 The personal involvement of the Secretary in the decision also explains the alleged failure of the Department to process the matter through normal procedural channels in the Department. When a statute directs a Cabinet officer to make a decision, that decision should not be criticized or found to be faulty because he did not delegate the groundwork to subordinates and then rubber stamp their decision.
 
 The majority opinion also states that:
 
 72
 Secretary Volpe did not consult with other planning agencies to coordinate efforts to minimize harm to the park and historic sites.
 
 
 73
 Majority opinion, page 1239. This statement refers to something that is not required by the statute. It seems clear that the provision of section 138 requiring "all possible planning to minimize harm to such park . . . or historic site from such use"[7] does not require that the Secretary of Transportation "consult with other planning agencies to coordinate efforts to minimize harm to the park and historic sites."[8] (Emphasis added). The majority opinion while it does not state so exactly, seems to be trying, by such language, to give the National Capital Planning Commission a voice in the Secretary's decision by compelling the Secretary to "consult" with them. But the statute does not so provide. It requires only that the Secretary engage in all possible planning and not that he consult every group that may have an axe to grind-he may consult with such groups but there is no requirement that he do more than indulge in "all possible planning." Clearly consulting is something more than planning. The statute directs the Secretary to make the decision and he is not forced to share that decision with outside agencies under the guise of consulting. The statutory requirements are already cumbersome enough without having the majority try to invent new requirements.
 
 
 74
 As for air pollution, I find the trial court's finding that "air pollution was an overall consideration in this as well as all interstate highway projects"[9] to completely satisfy any requirement in this respect. Moreover, it seems obvious to me that the bridge would not create any air pollution, and that to the extent that it relieved highway congestion on the present highways in the parks it would decrease air pollution. In this respect, as in other instances, appellants and the majority are straining at gnats. Instead of sustaining appellants' vague generalized objections to the present plans, I would require the objectors to show precisely how some of the plans being considered by the Secretary failed to meet the statutory standard or that some other feasible plan would cause less harm.
 
 
 75
 It also seems to me that, in requiring approval by the Secretary of final engineering plans for all details before the project can proceed, the majority are giving an overly technical, legalistic and impractical interpretation to the statute. What the Act requires is that the Secretary "not approve any program or project . . . unless there is no feasible and prudent alternative . . . and all possible planning to minimize harm . . .." was indulged in. To my way of thinking this would permit the Secretary to approve a program or project which is described by general specifications and reasonably precise locations without having the final blueprints. Certainly as a practical matter there must be room for some preliminary approval prior to the preparation of blueprints because no government is going to spend the millions of dollars necessary to prepare the final drawings without some prior approval that the drawings are being prepared along lines acceptable to the approving authority. If it subsequently develops that the final plans for some phase of the project do not meet the statutory standards they may be attacked at that time. Alternatively, the preliminary plans could be attacked upon a showing that they did not meet statutory standards. But there is neither such showing here, and I would not hold up projects, as the majority holds up this project, unless the objectors could demonstrate that substantial harm would result from the presently existing plans which would be alleviated by some other plan. Insofar as this affects the possible ramps and interchanges here it would be a relatively simple matter to consider all the "limited alternatives" and make a decision thereon. I would thus not remand for any purpose connected with section 138.
 
 
 76
 Section 134-Comprehensive Transportation Planning Process
 
 
 77
 This section requires the Secretary to cooperate with the states and not approve highway projects unless he finds them to be based on a continuing comprehensive transportation planning process carried on cooperatively by "states and local communities."[10]
 
 
 78
 In considering the requirements of this section the majority reverse the trial court by concluding that the Public Roads Division Engineer (Mr. Hall), to whom the Secretary delegated his responsibility under section 134, had improperly in turn delegated his responsibility to the Transportation Planning Board (TPB) of the Metropolitan Washington Council of Governments (COG), because, they allege, Mr. Hall believed that "TPB was the primary agency to which he should look in making his finding." But certainly the belief that TPB was "the primary agency" for such purposes does not constitute a delegation of his authority. The record thus does not support the majority's finding of improperly delegated authority.
 
 
 79
 Moreover, the TPB was the only agency in the area that did satisfy the requirement of the statute of a body carrying on a "continuing comprehensive transportation planning process . . . cooperatively by states and local communities . . .." Also, as the trial court noted, the District of Columbia, through resolution of its Board of Commissioners on June 17, 1965, provided for the District's participation in the planning processes carried on by TPB.
 
 
 80
 What is really involved in the majority's opinion in this respect, as with its criticism under section 138 that Secretary Volpe did not consult with other planning agencies, is another backhanded attempt to elevate the National Capital Planning Commission (NCPC) to a point where it can obstruct the project for its own ends. However, the NCPC is "concerned with planning solely for the District of Columbia," and thus does not meet the requirement of the statute for a planning organization being carried on "cooperatively by states and local communities." In contrast, the TPB is a regional organization[11] and does satisfy the statute. It is thus my conclusion that the majority exceeded its authority on this appeal when it ruled, contrary to the facts, that Mr. Hall had delegated his authority. Similarly, the majority are acting contrary to the statute, if they are attempting to compel the Secretary to be governed by the views of the NCPC. I might add that the situation here is not novel in the United States. Comprehensive highway plans traditionally run into many local objections, some selfish and some meritorious. When such situations arise they can only be solved by a fair application of the law, which I do not consider here justifies the majority in indirectly suggesting an interpretation of the statute that would give appellants, through the narrow interests of the NCPC, a whip hand in the final decision.
 
 
 81
 A further example of the tenuous rationale of the majority in its reversal appears in its attempted characterization of the TPB approval of the Three Sisters Bridge as a "stale" approval.[12] The TPB formally approved the Three Sisters Bridge in December 1967 as "consistent with comprehensive planning in the region" and since that time, as the District Court found, "the TPB has continuously reviewed the transportation system for the area and . . . the approval of the Three Sisters Bridge has never been rescinded."[13] The Division Engineer of the Bureau of Public Roads (Mr. Hall) considered this approval of the bridge when he made his finding in August or September, 1969, that the project was "based on a continuing comprehensive transportation planning process carried on cooperatively by states and local communities."[14] On these admitted facts, I consider it to be a gross distortion of the record to characterize Mr. Hall as acting upon a "stale" approval, when the original TPB approval was within twenty months, and the area transportation system had been "continuously reviewed" by the TPB since then without any alteration in its approval of the bridge. It is also incorrect to call such approval "inapposite." And to require a "comprehensive plan" (which the court refers to, whatever that might mean as applied to a project for a single bridge), as opposed to requiring that project to be consistent with "comprehensive planning," is to attempt to impose a requirement that is not imposed by the statute.[15]
 
 
 82
 I thus concur in the trial court's finding that the requirements of section 134 were fully complied with and dissent from the contrary conclusion of the majority here.Section 109(a)-The Safety of the Project
 
 
 83
 I concur in the trial court's conclusion to require further study of the structural feasibility of the bridge but dissent from that portion of the majority opinion which states that the Secretary "undertook no study of the [air pollution] problem." As previously stated the Secretary testified that "air pollution was an overall consideration in this as well as all interstate highway projects"[16]; thus I consider that the air pollution problem was properly considered and disposed of. I would further permit work to proceed upon the excavation for the piers because this work is in the nature of a preliminary test since preconstruction borings are not conclusive. Thus, according to the testimony there will always be some doubt as to the absolute feasibility of the location and plans until the excavation is completed for the piers. It is my view that given the approval of Congress, and the necessary available appropriations (both of which the project has), it is within the proper discretion of the Secretary to proceed to that extent.
 
 Section 128-The Location Hearing
 
 84
 Since the record is devoid of any proof that the present location of the bridge and ramps would affect the public in any manner substantially different from the three locations (which spread eagled the present location) discussed at the 1964 hearing, I would concur in the findings of the trial court that the public hearing requirements were substantially complied with. I thus dissent from the statement by the majority that the trial court's opinion was not clear that a finding had actually been made. To me it is perfectly clear that the court so found when it ruled that the present location was "not a new location" within the meaning of section 6a(1) of the PPM. The finding by the trial court that "no private property will be taken for the bridge or its ramps and interchanges" is also relevant to the finding with respect to the location.
 
 Section 317-The Map
 
 85
 This section requires that a map should be filed showing the portions of land which a department desires to appropriate. In this connection the majority opinion in footnote 61 refers to a letter of December 15, 1970 from the National Park Service and indicates that the plaintiffs may present this matter to the District Court for reconsideration of its ruling under Section 317. It seems clear, however, that the letter does not relate to any parkland but only to the "adverse impact (of traffic conditions) on the parkway (the highway)." It is thus my opinion that the letter would not have any relevance to any issue under section 317.
 
 
 86
 Congress, Representative Natcher and So-called Political
 
 Influence
 
 87
 In Part III of the majority opinion Judge Bazelon deals with the position of Congress and refers principally to some statements by Representative Natcher relating to the Three Sisters Bridge. The opinion infers that Representative Natcher by his acts was a party to forcing approval of the Three Sisters Bridge without regard to its merits, but the record does not so reflect. As the trial court found, Representative Natcher stated that he would do what he could to withhold appropriations for the construction of the District of Columbia rapid transit system "until the District complied with the 1968 Act" and "the freeway program gets under way beyond recall."[17] Representative Natcher was thus merely attempting to see that the laws enacted by Congress were carried out. The Three Sisters Bridge was just one of several freeway projects upon which Congress in 1968 had directed the District of Columbia to commence work.[18] It is not unusual or improper for Congress to withhold appropriations until its laws are complied with. In discussing the public position of Congress, as articulated by its laws and Representative Natcher, Judge Bazelon states:
 
 
 88
 [T]he impact of this [congressional] pressure is sufficient, standing alone, to invalidate the Secretary's action. Even if the Secretary had taken every formal step required by every applicable statutory provision, reversal would be required, in my opinion, because extraneous pressure intruded into the calculus of considerations on which the Secretary's decision was based. (Majority opinion, p. 1245)
 
 And further:
 
 89
 [T]he [trial] court determined as a matter of law that since the Secretary was not acting in a judicial or quasijudicial capacity, his decision would be invalid only if based solely on these extraneous considerations [the influence emanating from Representative Natcher]. (Majority opinion, p. 1246)
 
 
 90
 Judge Fahy does not agree that the trial court found that extraneous pressure had influenced the Secretary's decision and I find it impossible to read the findings and conclusions of the District Court as announcing that holding. In this respect the trial court's opinion states:
 
 
 91
 The mere fact that the Secretary was aware of the Congressional pressure to build the Three Sisters Bridge is not sufficient to invalidate his action in directing that the bridge be restored to the Interstate System. Since the issue in this suit is whether there has been compliance with Title 23 of the United States Code, the political pressure exerted by members of Congress is relevant only as to whether it may have caused Secretary Volpe to act without considering the merits of the project as required by Title 23. As will be discussed in connection with Sec. 138, Mr. Volpe commenced an exhaustive study of the merits of the Three Sisters Bridge project soon after taking office, and did not come to a decision that the bridge was essential until the Summer of 1969. The Court believes the Secretary's testimony that his decision was based on the merits of the project and not solely on extraneous political pressures. It is true that Mr. Volpe was also interested in securing the release of the rapid transit appropriations, and that the approval of the bridge led to the release of those funds. But the Court finds that the mere fact that the Secretary was aware of this pressure does not invalidate his decision that the Three Sisters Bridge is an important and necessary part of the Interstate Highway System.
 
 
 92
 ******
 
 
 93
 * * *
 
 
 94
 The plaintiffs contend that the Congressional pressure for the construction of the Three Sisters Bridge was of such a character that it can reasonably be inferred that it had some influence, conscious or unconscious, on the decision of the Secretary to redesignate the bridge as part of the Interstate System. From the evidence of the contemporaneous statements of Secretary Volpe, and his testimony in this case, there is no question that the pressure regarding the rapid transit appropriations was given some consideration at the time of the approval of the project in August, 1969. But the Court concludes that this does not invalidate the decision of the Secretary in this case. . . . The statute commits the decision to the Secretary's discretion. There is no requirement that he base his decision only on matters presented at a public hearing, but rather, there is only the implied requirement that he base his decision on the merits of the project. In view of the Secretary's testimony that he made an exhaustive review of the merits of the project and based his decision on that study, this Court will not invalidate his decision. The present case is further distinguishable from Jarrott in that there the contracts with the Board were secret, while here the actions of Congressman Natcher and others are a matter of public record contained in official Congressional documents and speeches made on the floor of the House of Representatives. [Footnote omitted, emphasis added.]
 
 
 95
 D.C. Federation of Civic Associations v. Volpe, 316 F.Supp. 754, 765, 766-767 (D.D.C.1970).
 
 
 96
 It is submitted that any fair reading of the trial court's opinion cannot twist its language to support Judge Bazelon's conclusion that it held that the Secretary's decision would be invalid "only if based solely on these extraneous considerations." While the trial court found as a fact that the Secretary's decision was "based on the merits of the project and not solely on extraneous political pressures," this is only one of several fact findings; it is not the basis for the decision of the trial court and such factual finding is not the application of any rule of law. The trial court also found that "the mere fact that the Secretary was aware of this [congressional] pressure does not invalidate his decision . . . ." But most importantly, the controlling conclusions by the trial court recognized the "implied requirement that the [the Secretary] base his decision on the merits of the project" and that the Secretary had
 
 
 97
 made an exhaustive review of the merits of the project and based his decision on that study, [and] this Court will not invalidate his decision. (Emphasis added.)
 
 
 98
 It thus seems clear to me that the trial court (Chief Judge Sirica) thereby found that the Secretary had based his decision upon the merits of the project. I specifically concur in this conclusion of the trial court and disagree with Judge Bazelon's solitary conclusion with respect to this phase of the case. Judge Fahy also does not agree with Judge Bazelon that the trial court found that extraneous pressure had influenced the Secretary's decision. It is thus clear that as presently articulated in these opinions a majority of the judges on this panel do not require that new determinations "on the merits" be made because of the interjection of any, for want of a better name, political pressure.
 
 
 99
 Judge Bazelon's opinion also discusses the relevance of the position of Congress on the appropriations to the matter of the Three Sisters Bridge. Under Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971), the Supreme Court indicated that "The court must consider whether the decision [on the use of parklands] was based on a consideration of the relevant factors." I find that the trial court made the proper finding when it determined after a lengthy trial that the Secretary based his decision on a "review of the merits of the project . . . [and] . . . that study." While the majority opinion states it is not holding that the bridge can never be built, if Judge Bazelon's individual view as to the position of Congress in this and other matters were to prevail, the result would come close to setting up legalistic standards which are practically impossible of compliance. Judge Bazelon's opinion would do that here by deciding, contrary to the finding of the trial judge, that because a member of the Cabinet had knowledge of the position of Congress on appropriations for subways and highways in the District of Columbia that his decision with respect to the merits of a highway project must necessarily have been improperly influenced by that information.
 
 
 100
 Actually any member of the Cabinet worthy of his position would necessarily know the position of Congress on such matters. No person with the position and ability to make the decision with respect to the Three Sisters Bridge would be ignorant of the publicly expressed congressional position on such matters. What Judge Bazelon fails to consider is that there were congressional pressures both ways and that the trial judge after full consideration found as a fact that the Secretary based his decision on a study of the merits of the project. For an appellate court to reverse such conclusion on this appeal is to overstep its authority to determine whether the action of the Secretary was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." The Supreme Court has said that this court has no authority to set aside the Secretary's action on a finding that it was "not supported by substantial evidence" or "unwarranted by the facts." Citizens to Preserve Overton Park v. Volpe, supra, 401 U.S. at 414, 91 S.Ct. 814, 28 L.Ed.2d 136. Likewise, the credibility of witnesses is a matter in which the trial judge is normally considered to have a particular province in actions tried upon the facts without a jury. Fed.R.Civ.P. 52(a).[19] Judge Bazelon's view of the matter would violate both of these rules.
 
 
 101
 Judge Bazelon also reflects an overly suspicious view with respect to the effect of so-called political pressures. An individual's attitude toward this type of question is closely related to his individual trust in human beings-whether he believes a human being can resist improper pressures. I do not find it unusual for a Cabinet member to be capable of resisting such pressures. Moreover the law is that in the absence of evidence to the contrary (and there is no such evidence here) public officers are to be presumed to perform official acts in accordance with the law.[20] As I read Judge Bazelon's opinion, however, it is his individual view that such pressures are irresistible. In the face of such colossal distrust of Government officials, the mere existence of the vestiges of pressure becomes equivalent to the reality of duress. I find that conclusion to be unsupportable-and contrary to law.
 
 
 102
 The realities of this situation are that under the Constitution the Congress of the United States has a wider voice in the affairs of the District of Columbia than it does in the affairs of states or other cities. Pursuant to its constitutional mandate Congress does take a firm hand in matters affecting the District and that is precisely what this court found was lacking in the first case (1968) involving the District highway program. D.C. Federation of Civic Associations, Inc. v. Airis, 129 U.S.App.D.C. 125, 391 F.2d 478 (1968). But no Congressman has any weight in such matters beyond his ability to speak for Congress and to the extent that he does speak for Congress he is only calling attention to the expressed will of Congress.
 
 
 103
 Congress has spoken in this matter. In Section 23 of the Highway Act of 1968[21] it ordered the erection of the Three Sisters Bridge, not as a single project but as part of the broad highway improvement program for the Washington Metropolitan Area. And Congress and those who speak for it have a continuing interest in seeing that the expressed will of Congress, as clearly enunciated in a statute signed by the President, be carried out.
 
 
 104
 Moreover, Congress has also declared that the relationship of the highway improvement program in any state, or the District of Columbia, be coordinated with plans for improvements in other affected forms of transportation (this would include subways) which are formulated with due consideration to their public effect on the future development of larger urban areas. In this respect Title 23, Sec. 134, provides as follows:
 
 
 105
 Sec. 134. Transportation planning in certain urban areas
 
 
 106
 It is declared to be in the national interest to encourage and promote the development of transportation systems, embracing various modes of transport in a manner that will serve the States and local communities efficiently and effectively. To accomplish this objective the Secretary shall cooperate with the States, as authorized in this title, in the development of long-range highway plans and programs which are properly coordinated with plans for improvements in other affected forms of transportation and which are formulated with due consideration to their probable effect on the future development of urban areas of more than fifty thousand population. After July 1, 1965, the Secretary shall not approve under section 105 of this title any program for projects in any urban area of more than fifty thousand population unless he finds that such projects are based on a continuing comprehensive transportation planning process carried on cooperatively by States and local communities in conformance with the objectives stated in this section. Added Pub.L. 87-866, Sec. 9(a), Oct. 23, 1962, 76 Stat. 1148. (Emphasis added).
 
 
 107
 Thus, this congressional mandate applies to both the subway and to the highway program for the Washington Metropolitan Area with which we are here concerned. To the extent that it provides that the Secretary shall not approve highway projects in larger urban areas unless he finds such projects are based on a continuing comprehensive (i.e., rail and highways) transportation planning process in conformance with the objectives stated in Section 134, it is essential that the Secretary of Transportation in approving highway plans be concerned with the program to build subways in the District of Columbia. Indeed it would be impossible and contrary to law for any Secretary of Transportation to pass on any major highway project in the District of Columbia without being familiar with and considering its effect and relationship to the subway construction program. In carrying out this statutory duty the Secretary must determine, in this case with respect to the District of Columbia, that the proposed subway and highway plans will combine to produce "modes of transport in a manner that will serve the States and local communities [here the Washington Metropolitan Area] efficiently and effectively." It is obvious, if the subway program were to proceed without the necessary highway construction, that the modes of transportation being built would not be efficient or effective. To this extent some joint consideration of subway and highway construction (including the Three Sisters Bridge) was a relevant matter and I do not find that the Secretary exceeded his authority by giving such matters more weight or consideration than was required by the statute.
 
 
 108
 In its discussion of "prudent alternatives" the majority opinion really attempts to define the problem as being one to determine whether a unique problem of extraordinary magnitude was posed by the potential loss of appropriations for the District subway. This is completely foreign to what section 138 is all about and does nothing more than indicate a preoccupation with the position of Congress. Actually when section 138 speaks of prudent alternatives it refers to alternatives to the use of parkland for the erection of the bridge at one location or another. The majority generally ignore the fact that the topographical features of the river with the high, steep banks of the Potomac Gorge, when coupled with the existing highways and parklands on both sides of the river, would cause the location of any other bridge that would meet the traffic congestion problem to affect existing parklands in a substantially similar manner to the Three Sisters project. The case is unique in those respects. It is obvious that the viable alternatives would affect parklands substantially to the same extent.
 
 
 109
 The majority also ignore the fact that the so-called parklands involved on the Virginia side of the river are all in the George Washington Memorial Parkway. Highways have always been an important part of this highway park. The George Washington Memorial Parkway was established by Congress (46 Stat. 482 et seq.) as a narrow elongated parkway along both banks of the Potomac River from Mt. Vernon and Fort Washington to the Great Falls of the Potomac. It parallels the Potomac River from Mt. Vernon to a point above the Great Falls on the Virginia side, except for the City of Alexandria, and from Fort Washington (in Maryland across from Mt. Vernon) to a similar point above the Great Falls on the Maryland side, except within the District of Columbia. One of the congressional purposes in establishing the parkway as a memorial was to provide for the construction of extensive highways within the dedicated area. The legislation also sought to protect and preserve the natural scenery of the Potomac Gorge and the Great Falls of the Potomac, to preserve the historic Patowmack Canal and to acquire that portion of the Chesapeake and Ohio Canal below Point of Rocks (46 Stat. 482-483).
 
 
 110
 The fact that this park has to a substantial extent, and always has had extensive highways within its confines, makes it practically impossible for any proposed bridge in this area to be erected without affecting some of its lands. This results from the fact that much of the traffic congestion which the proposed bridge seeks to relieve is traffic over the automobile highways within the parkway itself.
 
 
 111
 It is thus submitted that (1) the restrictive alternatives occasioned by the topography and location of the parklands, and (2) the nature of the parkland here involved, established by congressional legislation with substantial highways within its confines as one of its principal purposes, make the proposed Three Sisters Bridge a unique problem. It should also be noted that this highway park was established by Congress and that Congress has power by a subsequent act to change it.
 
 
 112
 In its peroration to Part II the majority opinion attempts to disclaim obvious implications of its decision. However, in so doing, it merely emphasizes the partial and slanted view it takes of the facts. Thus it states they are not suggesting any impropriety in the acts of those who "strongly advocate the bridge"; then next imply that there is some question as to the authority of such persons to exert pressure on Secretary Volpe which resulted in placing the Secretary in such an extremely treacherous position; and then conclude by denying that they are suggesting that Secretary Volpe acted in bad faith or in deliberate disregard of his statutory responsibility. Finally, they set aside the Secretary's finding on grounds which the Secretary testified under oath did not exist and the finding of the trial court supported the Secretary's finding. The result reached by the majority opinion thus contradicts its disclaimers. So whether the majority are implying that the Secretary acted contrary to his statutory responsibilities or not, they end up at exactly the same place as though he had.
 
 
 113
 However, all of this buys time for the objectors and keeps alive the hope that a new Secretary or a new Council will succumb to pressure and disapprove the project. The majority opinion does not criticize pressure from the objectors and it does not fully state the history of the prior approvals and disapprovals of the project. Originally the Three Sisters Bridge was designated as part of the entire metropolitan freeway project. Nothing in this record indicates that this was not a decision on the engineering merits uninfluenced by any improper pressures. However, in the waning days of an outgoing Presidential Administration, the then Secretary of Transportation on January 17, 1969, three days before a new administration was to take office, deleted the bridge from the Interstate Highway System following disapproval of the bridge project by the District government. The majority do not question the basis of this action, but only attack the reversal of this decision.[22] It may well be that they should question the background of that decision rather than what may well have been a rectification of a prior error or improper action.
 
 Procedure on Remand
 
 114
 In the conclusory paragraph of its opinion the majority suggests that the Secretary establish a "full scale administrative record which might dispel any doubts about the true basis of his action." When members of an appellate panel, for no reason more substantial than their own innate suspicion, elect to disbelieve the sworn testimony of a member of the Cabinet that his final decision was not influenced by outside factors, and also to circumvent the factual finding of the trial court to the same effect, in my opinion, it is not likely that a more extensive administrative record would cause them to believe him in the future. A court that has gone to the great extremes that this court has to reverse the trial court here can always find reasons satisfactory to it for avoiding practically any subjective decision required with respect to the bridge. It may well be that the only hope to carry out the expressed will of Congress lies with the Supreme Court.
 
 
 115
 To the extent that the majority opinion differs from the views hereinbefore set forth, I respectfully dissent and I concur in the remainder.
 
 SUPPLEMENTAL OPINION
 
 116
 FAHY, Senior Circuit Judge, with whom BAZELON, Chief Judge, concurs:
 
 
 117
 Our decision in D.C. Federation of Civic Ass'ns v. Volpe, 148 U.S.App.D.C. 207, 459 F.2d 1231 (1971), issued October 12, 1971, was rendered on appeal by the plaintiffs in the litigation from the decision of the District Court in D.C. Federation of Civic Ass'ns v. Volpe, 316 F.Supp. 754 (1970). In important respects we agreed with the findings of the District Court in that case that the Secretary of Transportation had not complied with certain applicable provisions of Title 23 of the United States Code. We could not agree, however, with the rulings of the District Court that the Secretary in other important respects had met the requirements of Title 23. We accordingly remanded the case with directions that construction of the bridge be enjoined until those requirements are met, as set forth in our opinion.
 
 
 118
 The plaintiffs had also contended in the District Court that the defendants were required and had failed to comply with statutory provisions other than Title 23, including certain provisions of the Code of the District of Columbia. In rejecting this contention the District Court held that the project had been exempted by Section 23 of the Federal-Aid Highway Act of 1968[1] from compliance with all statutory provisions "other than those of Title 23 of the U.S. Code." Plaintiffs-appellants renewed their contention in this court. Because the parties had not squarely faced this problem in their briefs before us when we rendered our October 12, 1971, decision, we asked for supplemental briefs, which have been filed. We now decide the questions thus reserved.
 
 
 119
 * The relevant provisions of Title 7 of the D.C.Code are Secs. 108, 109, 115 and 122, briefly described in an Appendix to this opinion.[2] We have concluded, as more fully to be explained, that further compliance with these provisions is not required insofar as they apply to the Three Sisters Bridge project.
 
 
 120
 Section 23 of the Federal-Aid Highway Act of 1968 was the legislative response to the administrative decision of certain District of Columbia officials to abandon the bridge project, and in response also to the decision of this court in D.C. Federation of Civic Ass'ns v. Airis, 129 U.S.App.D.C. 125, 391 F.2d 478 (1968), requiring compliance with Title 7 of the D.C.Code, "particularly Secs. 7-108 to 7-115." By Section 23, Congress directed that construction of the bridge go forward "notwithstanding any other provision of law, or any court decision or administrative action to the contrary," subject, as we held in D.C. Federation of Civic Ass'ns v. Volpe, 140 U.S.App.D.C. 162, 434 F.2d 436 (1970), to compliance with the applicable provision of Title 23 of the United States Code.[3] This court pointed out in its opinion in that case that "it was Congress' intention to countermand the District Government's 'administrative action' which had stopped further interstate construction," adding in a footnote: "Presumably, the 'court decision' language [of Section 23] refers to our decision in Airis, but the reference is mistaken since that decision was not to the contrary." This court thus construed Section 23 in essence as a direction to the local and federal authorities to continue with the bridge plans formulated prior to Airis; but the court did not pass upon the precise question now before us, whether Section 23 exempted the bridge project from further compliance with those provisions of Title 7 of the D.C.Code which had been before the court in Airis. That case was not to the contrary of the intent of Section 23 that the bridge should be built; but the local Code provisions which had been held in Airis to be applicable to the bridge project we think became inapplicable by the subsequent enactment of Section 23 to the extent that compliance with those provisions would conflict with the provisions of Section 23 that work on the bridge should commence within 30 days. The reasonable conclusion to draw now from the ambiguous situation presented seems to us to be that such compliance with those provisions as had not occurred by the end of the 30 day period does not constitute a condition to the approval or construction of the project. This does not preclude the authorities from taking advantage of any of the provisions which they might find to be desirable or useful in connection with the project.
 
 II
 
 121
 We have not overlooked that appellants also invoke certain provisions of the D.C. Code other than those in Title 7, namely, D.C.Code Secs. 1-1005(a), 1407(a) (7) and 8-115, also briefly described in the Appendix to this opinion. We did not include these provisions among those which our October 12, 1971 decision reserved for further consideration. See footnote 2, supra. Nevertheless, we consider them. The issue as to their applicability to the project had been presented to the court in Airis, although they did not surface in the opinion. We think they are also fairly included in the target of Section 23. Even were we to interpret the omission from the Airis opinion of any discussion of these provisions to mean that the court regarded them as applicable to the bridge project we nevertheless think the impact of Section 23 upon these provisions is the same as we have construed its impact to be upon the Title 7 provisions, as above set forth. The language of Section 23, and its history and objective, persuade us that the overriding intention of Congress was also to exempt the project from the necessity of further compliance with these recommendatory and consultative provisions of the local Code.[4]
 
 
 122
 Clearly one of the objectives of Congress was to have the bridge project go forward promptly. The "notwithstanding * * * any law * * * to the contrary" language, construed in light of this objective, and of the history of the project, bears a construction that the provisions of the D.C.Code now considered should not delay or bar the authorities from proceeding. As we explained, however, in D.C. Federation of Civic Ass'ns v. Volpe, 140 U.S.App.D.C. 162, 434 F.2d 436 (1970), Congress did not intend that the bridge should go forward without complying with "all applicable provisions of Title 23 of the United States Code." Those provisions having been brought into Section 23 itself, were not to the contrary of Section 23.
 
 III
 
 123
 We consider finally whether the appellees must comply with 16 U.S.C. Secs. 470, 470f, which are part of the United States Code. Only Section 470f is really involved. It provides that in the case of a project such as the Three Sisters Bridge the head of the Federal Agency having direct or indirect jurisdiction, prior to the approval of the expenditure of any federal funds on the undertaking, shall take into account the effect of the undertaking on any site that is included in the National Register of historical sites, and shall afford the Advisory Council on Historic Preservation, established under Title 16, a reasonable opportunity to comment on the undertaking. This provision was not considered in Airis and it is not a local highway statute. It is a part of a national plan to protect historic sites. Section 23 of the 1968 Act was passed, as we understand its purpose, to free the bridge from further planning under the local statutes. We cannot say that Congress also intended to render inapplicable this federal law of general application affecting historic sites. The Secretary of Transportation is a member of the Advisory Council on Historic Preservation created by 16 U.S. C. Sec. 470. Accordingly, if he has not already done so since our decision in D.C. Federation of Civic Ass'ns v. Volpe, 140 U.S.App.D.C. 162, 434 F.2d 436 (1970)- we understand he may already have done so-the Secretary is required to comply with Section 470f before final approval of the project, for areas affected by the bridge project are listed in the National Register.[5]
 
 
 124
 As to 33 U.S.C. Secs. 401, 403 and 525, and 49 U.S.C. Sec. 1655, referred to in footnote 2, supra, apparently appellants and appellees agree that the authorities have complied with these provisions. No issue with respect to them is raised on this appeal.
 
 
 125
 Judgment accordingly.
 
 APPENDIX
 
 126
 7 D.C.Code Sec. 108 prohibits the construction of any highway in the District at a width of more than 160 feet.
 
 
 127
 D.C.Code Secs. 7-109, 7-115 and 7-122 require that whenever the D.C. Government proposes a new highway plan, the plan must be the subject of a public hearing with notice given to the affected landowners. A map reflecting the plan shall be prepared and certified to the National Capital Planning Commission for modification and approval, followed by filing and recording with the District Surveyor.
 
 
 128
 D.C.Code Sec. 1-1005(a) requires any agency of the District Government, when it plans a new highway project, to consult NCPC in an effort to conform agency plans with over-all NCPC planning for the National Capital.
 
 
 129
 D.C.Code Sec. 8-115 authorizes Federal and District authorities administering U.S.-owned property to transfer jurisdiction over such properties, for purposes of administration and maintenance, among themselves, provided the recommendation of the NCPC is first secured and that all such transfers are reported to Congress.
 
 
 130
 D.C.Code Sec. 1-1407(a) (7) requires the District to submit its plans for highway projects to WMTA for its review. (This provision repealed Dec. 9, 1969, P.L. 89-774, Sec. 8(a) (1), 83 Stat. 322.)
 
 
 131
 16 U.S.C. Sec. 470f, requires the Secretary of Transportation to give the Advisory Council on Historic Preservation a reasonable opportunity to comment on plans for an interstate highway project that will affect historic areas in the National Register.
 
 
 132
 MacKINNON, Circuit Judge (concurring specially and dissenting in part):
 
 
 133
 I concur in the Supplemental Opinion of Judge Fahy except to the extent that it differs from my prior dissenting opinions in D.C. Federation of Civic Associations v. Volpe, 140 U.S.App.D.C. 162, 434 F.2d 436 (1970) and D.C. Federation of Civic Associations v. Volpe, 148 U.S.App. D.C. 207, 459 F.2d 1231 (Nos. 24838 & 24843, dissenting opinion filed 11/4/71), and to my views herein expressed.
 
 
 134
 Judge Fahy's opinion at pages 4-5 would have initially exempted the Three Sisters Bridge project from compliance with those provisions that would conflict with the provisions of section 23 of the Highway Act of 1968 so that work on the bridge could have commenced within thirty days. That date having passed he now concludes that compliance with those provisions as had not occurred by the end of the 30-day period does not constitute a condition to the approval or construction of the project. I would express our opinion more affirmatively. In my view the provisions of section 23 of the Highway Act of 1968 effectively eliminated the application of any provisions of the D.C.Code which would conflict with the construction schedule or plans referred to in the Act for-
 
 
 135
 those routes already under construction . . . [and] all routes [to be constructed] on the interstate system within the District of Columbia as set forth in the document entitled "1968 Estimate of the Cost of Completion of the National System of Interstate and Defense Highways in the District of Columbia" submitted to Congress by the Secretary of Transportation with, and as a part of, "The 1968 Interstate System Cost Estimate" printed as House Document Numbered 199, Ninetieth Congress. (82 Stat. 827)
 
 
 136
 The Congress clearly incorporated the 1968 District of Columbia Highway Estimate, and whatever it includes, into the law so that its plans, routes, specifications and schedules should be controlling.
 
 
 137
 Judge Fahy's opinion also concludes that pursuant to Title 16 U.S.C. Sec. 470f, the Department of Transportation should be required to afford the Advisory Council on Historic Preservation a reasonable opportunity to comment with regard to the Three Sisters Bridge project insofar as it may affect any district, site, building, structure or object that is included in the National Register. Section 470f was enacted on October 15, 1966.[1] It provides:
 
 
 138
 The head of any Federal agency having direct or indirect jurisdiction over a proposed Federal or federally assisted undertaking in any State and the head of any Federal department or independent agency having authority to license any undertaking shall, prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license, as the case may be, take into account the effect of the undertaking on any district, site, building, structure, or object that is included in the National Register. The head of any such Federal agency shall afford the Advisory Council on Historic Preservation established under sections 470i-470n of this title a reasonable opportunity to comment with regard to such undertaking. (80 Stat. 917)
 
 
 139
 This requires the head of any Federal agency having jurisdiction over the Three Sisters Bridge to take into account the effect of that project on any area or structure included in the National Register and to afford the Advisory Council on Historic Preservation a reasonable opportunity to comment with regard to such project.
 
 
 140
 An exchange of correspondence included in the record below[2] reveals the Department of Transportation, on its own initiative, made a presentation at the February 7, 1968 meeting of the Advisory Council of the District of Colombia highway program in general and the Three Sisters Bridge project in particular. In the follow-up correspondence to this presentation, the Council's comments on these projects were expressly solicited. I find in this correspondence ample demonstration that the effects of the project on sites included in the National Register were considered within the Department of Transportation, and that the Advisory Council on Historic Preservation was given a reasonable opportunity to comment thereon. I accordingly, respectfully dissent from the suggestion that the Council be afforded an additional opportunity to comment.
 
 
 141
 ON DENIAL OF REHEARING BY THE DIVISION OF THE DECISION OF
 
 OCTOBER 12, 1971
 
 142
 FAHY, Senior Circuit Judge, with whom BAZELON, Chief Judge, concurs:
 
 
 143
 On December 2, 1971, an order was entered denying appellees' suggestion for a rehearing en banc of the decision of October 12, 1971, which had been rendered by a three-judge division of the court. On the same date the division, consisting of Chief Judge Bazelon, Circuit Judge MacKinnon and myself, also denied a rehearing. Judge MacKinnon who had dissented from the decision of October 12, 1971, would have granted a rehearing. Each of us reserved the right to file later a statement of reasons for our position as to the denial of rehearing. This I now do in brief form.
 
 
 144
 * By Secs. 23(a) and (b) of the Federal-Aid Highway Act of 1968, to which reference has been made in the foregoing Supplemental Opinion, Congress provided among other things that the Secretary of Transportation and the District of Columbia should resume construction of the abandoned bridge project as soon as possible after enactment, the construction to be
 
 
 145
 carried out in accordance with all applicable provisions of title 23 of the United States Code.
 
 
 146
 Work was to commence not later than 30 days after enactment. Work did commence but was brought to a halt by the litigation which questioned whether the construction was being carried out "in accordance with all applicable provisions of title 23 of the United States Code." This court had held in D.C. Federation of Civic Ass'ns v. Volpe, 140 U.S.App. D.C. 162, 434 F.2d 436 (1970), that the applicable provisions of Title 23 included those governing "both the planning and building" of the bridge. This interpretation of the intention of Congress created a conflict with the implications of the intention expressed in the 30-day clause. The difficulty was resolved of necessity by suspension of the work while the questions thus raised were settled. Obviously the substantive provisions of Title 23, involving, inter alia, vital decisions of the Secretary of Transportation, took precedence over the apparently inconsistent time provision. The project could not proceed in disregard of Title 23. Accordingly, our 1970 decision, next above cited, required a remand of the case to the District Court for an expedited hearing with respect to compliance with Title 23. The Government did not seek Supreme Court review of that decision, and it became the law of the case. The soundness of this court's remand was soon manifested by the further proceedings in the District Court which we reviewed in our decision of October 12, 1971. As the opinion of the District Court on the remand revealed, approval of the Bridge project had been given when the planning was incomplete and fell short of statutory requirements in important respects. Extant were questions even of structural feasibility, involving safety, as well as of final design and location of ramps and interchanges. Moreover, a finding that only the minimum acreage of parkland would be taken fell altogether short of the content necessary to meet the statutory requirement of minimum harm to parkland. Furthermore, the approved location of the bridge on the District of Columbia side of the river was 1500 feet off from the nearest location considered in the 1964 public location hearing. The District Court's opinion did not reveal a factual basis to support its conclusion that the approved location was so similar to that subject to the public hearing as to eliminate the need for a fresh location hearing.
 
 
 147
 The situation thus briefly outlined with respect to compliance with the applicable provisions of Title 23 called upon this court to hold that the approval given by the Secretary was, as a legal matter, not in conformity with the applicable statutes, and that the findings and conclusions of the District Court that they were, could not be accepted under the standards of judicial review applied in such a case by the Supreme Court in Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 414-415, 91 S.Ct. 814, 28 L.Ed.2d 77 (1971).
 
 
 148
 It is well to keep in mind that Title 23 of the United States Code is a comprehensive congressional enactment governing the deep involvement of the federal government in the Interstate Highway System, of which the Three Sisters Bridge was to be a part. The provisions of the Title could hardly find a more appropriate place for careful application than in and about the Capital of the nation, especially if a proposed project encroaches upon parklands and historic sites, both subjects of express congressional solicitude. It therefore was quite natural, notwithstanding the desire that the bridge project proceed promptly, for Congress also to require compliance with the applicable provisions of Title 23. It is equally well to note, as the Government points out, that in such a project the Secretary must be permitted to make decisions in what might be called a progessive manner-not everything can be pulled together all at once. But when decisions necessary to final approval are made, such as those required with respect to parklands by Section 138 of Title 23, they must be made conditionally and tentatively, subject to readjustment and reconsideration as the process toward final determination goes forward. And final approval must await and be dependent upon completion of this process.
 
 
 149
 In thus briefly supplementing our October 12, 1971, opinion, we refer to it in the respects there more fully stated as reasons for our denial of the motion for rehearing.
 
 MacKINNON, Circuit Judge (dissenting):
 
 150
 I dissent from the denial of rehearing of the decision of October 12, 1971 for the reasons expressed in my opinion in that case, filed November 4, 1971.
 
 
 151
 The majority opinion comments that prior decisions on certain issues have become "the law of the case." While that rule of judicial practice imposes some restriction upon the trial court it does not prohibit the appellate court in a proper case from reconsidering its decision.[1] Also what is the law of the case with respect to the Court of Appeals is not the Supreme Court's law of the case.[2]
 
 
 152
 However, I concur in the statement expressed at page 1240 of the majority opinion that would allow Government agencies to make decisions conditionally and tentatively in a progressive manner. This conforms to the view expressed in my dissenting opinion filed November 4, 1971 in which I stated that I would permit work to proceed upon the excavation for the piers of the Three Sisters Bridge because Congress has approved the project, the necessary appropriations were available and the excavation is in the nature of a preliminary test since preconstruction borings are not conclusive.[3]
 
 
 
 [1]
 D.C. Federation of Civic Ass'ns, Inc. v. Volpe, 140 U.S.App.D.C. 162, 434 F.2d 436 (1970), holding that "both the planning and building of the Three Sisters Bridge [must] comply with all applicable provisions of Title 23." Id., at 447. In their complaint before the District Court on remand plaintiffs alleged that the Secretary had not complied with the following provisions: 23 U.S.C. Secs. 102, 103, 128(a), 134, 138, and 317 (1970), and the regulations implementing Sec. 128 (a), 23 C.F.R. Part 1, App. A (1970). Apart from alleged violations of title 23, plaintiffs also complained of violations of various sections of title 7 of the District of Columbia Code, and of 16 U.S.C. Secs. 1, 470; 33 U.S.C. Secs. 401, 403, 525; and 49 U.S.C. Sec. 1655 (1970). At the commencement of trial, the District Court granted plaintiffs' motion to amend their complaint to allege also a violation of 23 U.S.C. Sec. 109(a) (1970). The Court granted plaintiffs a hearing on each complaint under title 23, but not under any of the other statutory provisions. See pp. 1244, 1245, infra; D.C. Federation of Civic Ass'ns, Inc. v. Volpe, 316 F.Supp. 754, 761 & nn. 13-14 (D.D.C.1970)
 
 
 [2]
 316 F.Supp. 754 (D.D.C.1970)
 
 
 [3]
 140 U.S.App.D.C. 162, 434 F.2d 436 (1970)
 
 
 [4]
 316 F.Supp. 754 (D.D.C.1970)
 
 
 [5]
 Id. at 769
 
 
 [6]
 Id. at 774
 
 
 [7]
 Id. at 759
 
 
 [8]
 Id
 
 
 [9]
 On Jan. 17, 1969, the District's City Council had voted to approve the NCPC transportation plan which rejected the Three Sisters Bridge as unnecessary and undesirable. Id
 
 
 [10]
 Id. at 764, 767
 
 
 [11]
 Pub.L.No.90-495, 82 Stat. 827 (1968); cf. pp. 1244-1245 infra
 
 
 [12]
 For purposes of this opinion we refer to the D.C. Federation of Civic Associations, appellants (and cross-appellees) in this Court, as "plaintiffs," and to Secretary Volpe, the District of Columbia, and the other appellees (and cross-appellants) as "defendants."
 12a 23 U.S.C. Sec. 138 (1970).
 
 
 [13]
 401 U.S. 402, 411, 91 S.Ct. 814, 821, 28 L.Ed.2d 136 (1971) (emphasis added)
 
 
 [14]
 Id. at 412-413, 91 S.Ct. at 821
 
 
 [15]
 316 F.Supp. at 769
 
 
 [16]
 Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 409, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). But see note 88 infra
 
 
 [17]
 Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 420, 91 S.Ct. 814, 825 ("review [of the Secretary's decision] is to be based on the full administrative record that was before the Secretary at the time he made his decision"). See also Environmental Defense Fund, Inc. v. Ruckelshaus, 142 U.S.App.D.C. 74, 88 439 F.2d 584, 598 (1971)
 
 
 [18]
 Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 420, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); United States v. Morgan, 313 U.S. 409, 422, 61 S.Ct. 999, 85 L.Ed. 1429 (1941)
 
 
 [19]
 Cf. Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 420, 91 S.Ct. 814, 826, 28 L.Ed.2d 136 (1971) ("Such an explanation will, to some extent, be a 'post hoc rationalization' and thus must be viewed critically.")
 
 
 [20]
 Secretary Volpe testified, for example, that he "believed that he had consulted with Mr. Braman's office with respect to the Bridge project," (Transcript at 808-809), but Mr. Braman pointed out that his office was "not involved in the Three Sisters matter at any time." (Tr. at 1005.) The Secretary also testified that the Federal Highway Administrator, Mr. Turner, had discussed with him the Sec. 138 problem, and that the Administrator had made an oral recommendation. (Tr. at 722.) Nevertheless, Mr. Turner indicated in his testimony that he did not believe he had made any recommendation to the Secretary or had even discussed with him the specific question of the determination under Sec. 138. (Tr. at 977.) See generally Brief for Appellants at 34-35. Asked about his consideration of a number of alternatives to the Three Sisters Bridge, Secretary Volpe testified that he could not recall having considered the possibility of a tunnel at "any location other than the Three Sisters Islands," (Tr. at 780), upgrading the Jefferson Davis Highway to Interstate standards (Tr. at 779), or a number of other potential alternatives. See Brief for Appellants at 36-38
 
 
 [21]
 316 F.Supp. at 769-770. The procedures in question involved the Department's Office of Environmental and Urban Systems, headed by Mr. James Braman
 
 
 [22]
 Tr. at 644 (testimony of Secretary Volpe)
 
 
 [23]
 140 U.S.App.D.C. at 172, 434 F.2d at 446
 
 
 [24]
 Id. at 447
 
 
 [25]
 Cf. Environmental Defense Fund, Inc. v. Corps of Engineers, 325 F.Supp. 749, 761 (E.D.Ark.1971)
 
 
 [26]
 Testifying before the District Court, Secretary Volpe did indicate that he "had considered several alternatives including the bridge, no bridge, the tunnel, various types of ramp connections etc. . . ." (Tr. at 742) (emphasis added). It is possible, however, that the Secretary might have given that alternative (and the studies which seem to support it, see Brief for Appellants at 36 n. 2) more extensive consideration if his Department had not been convinced, judging by its representations before this Court, that "no bridge" was not a viable alternative in view of Section 23 of the Federal-Aid Highway Act of 1968
 
 
 [27]
 316 F.Supp. at 775 (emphasis added)
 
 
 [28]
 Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 405, 91 S.Ct. 814, 816, 28 L.Ed.2d 136 (emphasis added)
 
 
 [29]
 316 F.Supp. at 775
 
 
 [30]
 Compare Brief for Federal Appellees at 11: "The park areas underneath the bridge would, in essence, remain available for park purpose uses. . . ."
 
 
 [31]
 316 F.Supp. at 794
 
 
 [32]
 23 U.S.C. Sec. 134 (1970)
 
 
 [33]
 316 F.Supp. at 794
 
 
 [34]
 Id
 
 
 [35]
 316 F.Supp. at 794
 
 
 [36]
 Tr. at 1109
 
 
 [37]
 316 F.Supp. at 794
 
 
 [38]
 See Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 415-416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)
 
 
 [39]
 316 F.Supp. at 794
 
 
 [40]
 42 U.S.C. Sec. 3334 (1970); see 316 F. Supp. at 794 n. 57
 
 
 [41]
 Statement of President Johnson, August 23, 1968, 114 Cong.Rec. (Part 24) 30959 (1968)
 
 
 [42]
 The Secretary is not required, of course, to resolve every conceivable ambiguity in a proposed plan before testing its compliance with the applicable statutory provisions. But where he does purport to make a determination required by statute, for example under Sec. 134, in advance of the completion of planning, his determination must remain flexible and be subject to continuing reconsideration as the plans for the project mature
 
 
 [43]
 23 U.S.C. Sec. 109(a) (1970)
 
 
 [44]
 316 F.Supp. at 793
 
 
 [45]
 316 F.Supp. at 790
 
 
 [46]
 Tr. at 604
 
 
 [47]
 316 F.Supp. at 790
 
 
 [48]
 316 F.Supp. at 791
 
 
 [49]
 We express no opinion at this time on the amount or type of investigation which the Secretary should undertake in evaluating the air pollution hazards. In his testimony before the District Court, Secretary Volpe indicated that his Department "consider[s] air pollution in the overall consideration of all our projects," Tr. at 811, and it is possible that the consideration already given would satisfy the requirements of the statute. But the District Court made no findings on the Secretary's action, and approved the project apparently because the evidence seemed insufficient, in its view, to warrant a holding that the Department must undertake a study of the problem. 316 F. Supp. at 791. Rather than returning the case to the District Court for clarification of its findings on this point, it seems most efficient, in view of our remand to the Secretary under other provisions, to permit the Secretary to reconsider at the same time his determination under Sec. 109 (a)
 
 
 [50]
 23 U.S.C. Sec. 128(a) (1970)
 
 
 [51]
 Policy and Procedure Memorandum 20-8, 23 C.F.R. Part I, App. A (1970)
 
 
 [52]
 Naturally, we do not decide whether the design hearing held by the Department complied with the requirements of PPM 20-8 and Sec. 128(a). That question has not been presented to us. If plaintiffs have objections to the hearing, those objections should be lodged in the District Court
 
 
 [53]
 The plan under consideration in 1964, the so-called Howard Needles report, proposed three possible locations for a central Potomac crossing. 316 F.Supp. at 778
 
 
 [54]
 Id. at 779
 
 
 [55]
 Id. at 778
 
 
 [56]
 Id. at 779
 
 
 [57]
 The District Court made an additional finding of error under Sec. 128(a). The section requires that the "State highway department . . . certify to the Secretary that it has had public hearings. . . ." (emphasis added). The District Court held, and we agree, that the certifying officer "should be one who knows as a fact that the actions to which he is certifying have been taken." 316 F.Supp. at 789. The District Court found that the certifying officer had assumed that certification was appropriate "merely because the project had reached the stage where the certification is normally made." Id. That assumption, the District Court held, was an "insufficient basis for the certification." Id. at 790. The defendants do not contest that finding, and it is therefore affirmed
 
 
 [58]
 23 U.S.C. Sec. 317 (1970)
 
 
 [59]
 316 F.Supp. at 796-797
 
 
 [60]
 United States v. 10.69 Acres of Land, 425 F.2d 317, 319 (9th Cir. 1970)
 
 
 [61]
 Subsequent to the District Court's decision, the National Park Service announced in a letter (a photocopy of which is included in Brief for Appellants) that it does object to at least one aspect of the bridge plan. Letter from George B. Hartzog, Jr., Director, National Park Service, Department of the Interior, to Martin K. Schaller, Executive Secretary, Office of the Mayor-Commissioner, Dec. 15, 1970, reproduced in Brief for Appellants at App. A. That objection, moreover, includes an allegation that current plans for the bridge "conflict with [the Service's] understanding of the terms of an agreement signed May 25, 1966, by the National Park Service" and the Virginia and District of Columbia highway departments. It is precisely that prior-and, perhaps, misconstrued-agreement on which the government now relies to demonstrate compliance with the "spirit" of Sec. 317. The letter may, in other words, have undercut the factual predicate of the District Court's reasoning. Whatever the signifiance of this attempted supplementation of the record, it is clear that any doubts will be removed by our holding that the Secretary must comply with the letter of Sec. 317
 
 
 [62]
 At issue are 16 U.S.C. Secs. 1, 470; 33 U.S.C. Secs. 401, 403, and 525; 49 U.S.C. Sec. 1655 (1970), and various sections of title 7 of the District of Columbia Code
 
 
 [63]
 129 U.S.App.D.C. 125, 391 F.2d 478 (1968)
 
 
 [64]
 Pub.L. No. 90-495, 82 Stat. 827 (1968)
 
 
 [65]
 308 F.Supp. 423 (D.D.C.1970)
 
 
 [66]
 Plaintiffs clearly asked for a ruling in this Court on 16 U.S.C. Sec. 470f (1970), and provisions of title 7 of the D.C.Code. They have not explicitly asked for a ruling on any other non-title 23 provision
 
 
 [67]
 D.C. Federation of Civic Ass'ns, Inc. v. Volpe, 140 U.S.App.D.C. 162, 173, 434 F.2d 436, 447 & n. 50 (1970)
 
 
 [68]
 316 F.Supp. at 762. The "1968 Act," section 23 of the Federal-Aid Highway Act of 1968, is discussed at pp. 1244-1245 supra
 
 
 [69]
 316 F.Supp. at 762
 
 
 [70]
 Id. at 764-765 (emphasis added)
 
 
 [71]
 Id. at 766 (emphasis added)
 
 
 [72]
 Id. at 765-766 (emphasis added)
 
 
 [73]
 Id. at 765
 
 
 [74]
 See Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 414-415, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)
 
 
 [75]
 See, e. g., Pillsbury Co. v. FTC, 354 F. 2d 952 (5th Cir. 1966); Jarrott v. Scrivener, 225 F.Supp. 827 (D.D.C.1964)
 
 
 [76]
 See generally 2 K. Davis, Administrative Law Secs. 12.01 et seq. (1958)
 
 
 [77]
 Cf. Sangamon Valley Television Corp. v. United States, 106 U.S.App.D.C. 30, 269 F.2d 221 (D.C.Cir. 1959)
 
 
 [78]
 See, e. g., Pillsbury Co. v. FTC, 354 F. 2d 952, 964 (5th Cir. 1966)
 
 
 [79]
 10 U.S. (6 Cranch.) 87, 129-131, 3 L. Ed. 162 (1810)
 
 
 [80]
 Cf. Griffin v. County School Bd. of Prince Edward County, 377 U.S. 218, 231, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964); Gomillion v. Lightfoot, 364 U.S. 339, 347, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960). But see Palmer v. Thompson, 403 U.S. 217, 224-225, 91 S.Ct. 1940, 29 L.Ed.2d 438 (1971)
 
 
 [81]
 See 23 U.S.C. Sec. 103(d) (1970)
 
 
 [82]
 United States ex rel. Kaloudis v. Shaughnessy, 180 F.2d 489, 491 (2d Cir. 1950). See also United States ex rel. Accardi v. Shaughnessy, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954), a case remarkably similar to the one before us. Cf. Shaughnessy v. United States ex rel. Accardi, 349 U.S. 280, 75 S.Ct. 746, 99 L.Ed. 1074 (1955)
 
 
 [83]
 Cf. Perry v. Perry, 88 U.S.App.D.C. 337, 338, 190 F.2d 601, 602 (1951)
 
 
 [84]
 Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 823 (1971) ("the court must consider whether the decision was based on a consideration of the relevant factors") (emphasis added); Wong Wing Hang v. I. & N. S., 360 F.2d 715, 719 (2d Cir. 1966), cited with approval in Citizens to Preserve Overton Park, Inc. v. Volpe, supra, 401 U.S. at 416, 91 S.Ct. 814, 28 L.Ed. 2d 136; L. Jaffe, Judicial Control of Administrative Action 182 (1965)
 See also SEC v. Chenery Corp., 318 U.S. 80, 87-88, 92-94, 63 S.Ct. 454, 87 L.Ed. 626 (1942), where the Court pointed out, inter alia, that "[i]f an order is valid only as a determination of policy or judgment which the agency alone is authorized to make and which it has not made, a judicial judgment cannot be made to do service for an administrative judgment." Id. at 88, 63 S.Ct. at 459. Accord, SEC v. Chenery Corp., 332 U.S. 194, 196, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947); Sunbeam Television Corp. v. FCC, 100 U.S.App.D.C. 82, 243 F.2d 26 (1957) (Fahy, J.); Chae-Sik Lee v. Kennedy, 111 U.S.App.D.C. 35, 294 F.2d 231 (1961).
 It might be argued that a remand would be futile here since the agency can only repeat the process it purports already to have undertaken: namely, considering the project solely on its merits. While we agree that a remand would be academic if the agency would inevitably arrive at the same result, NLRB v. Wyman-Gordon Co., 394 U.S. 759, 766-767 n. 6, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969); Friendly, The "Limited Office" of the Chenery Decision, 21 Ad.L.Rev. 1, 5 (1968), it seems entirely possible that the agency could reach a different result if it could insulate itself from extraneous pressures unrelated to the merits of the question. On remand, the agency will have an opportunity to take steps to achieve the insulation required by statute and long-established principles of administrative law, perhaps by compiling a full-scale administrative record, utilizing fully intra-agency review procedures, and consulting with other agencies and planning groups.
 
 
 [85]
 Cf. Sunbeam Television Corp. v. FCC, 100 U.S.App.D.C. 82, 243 F.2d 26 (1957)
 
 
 [86]
 See Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 412-413, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)
 
 
 [87]
 Cf. id. at 419 n. 33, 91 S.Ct. 814, 28 L.Ed.2d 136
 
 
 [88]
 While formal findings are not required by statute, they are compelled by one of the Department's own internal regulations, DOT Order 5610.1, issued on October 7, 1970. See generally Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 417-419, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). That Order was not in effect at the time the Secretary's determinations were made. Plaintiffs argue that the Order should be applied retrospectively, and that it should therefore constitute an independent basis for reversal. While the Supreme Court rejected a similar claim in Overton Park, supra, that decision may be distinguishable in that a full administrative record was available there to facilitate review. Id. at 419, 91 S.Ct. 814, 28 L.Ed.2d 136. While the proposed distinction would seem to have a good deal of force, we need not reach the question in view of our conclusion that the Secretary failed, irrespective of DOT Order 5610.1, to make the determinations required by statute. When the Secretary makes new determinations on remand, the Order will presumably apply
 
 
 [1]
 The proposed bridge lies almost completely in the District of Columbia since the Potomac River is entirely within the District. The bridge approaches on the south bank would be within the jurisdiction of Virginia
 
 
 [2]
 Sec. 138 requires a determination that there was "no feasible and prudent alternative to the use of such land" and that the "program includes all possible planning to minimize harm to such park * * * or historic site." 23 U.S.C. Sec. 138
 
 
 [3]
 Georgetown as an historic site. The Old Georgetown District was created within the District of Columbia by Chapter 984, approved September 22, 1950 (64 Stat. 903). Its west boundary was fixed at "Archbold Parkway from Reservoir Road to the Potomac River * * *." The district so established would be slightly to the east of the presently prescribed location of the Three Sisters Bridge. If any of the ramps or interchanges were to come within said district, it is obvious from the maps that it would only touch a de minimis area at the southwest corner of the district which is devoid of buildings. Thus, the Three Sisters Bridge does not imperil the architecture in Georgetown. The Old Georgetown District was established "to preserve and protect the places and areas of historic interest, exterior architectural features and examples of the type of architecture used in the National Capital in its initial years * * *." (64 Stat. 904). To effectuate the intent of Congress the Act required the Commissioners of the District of Columbia before issuing any permit for the construction, alteration, reconstruction or razing of any building within the Old Georgetown District, to refer the plans to the National Commission on Fine Arts for a report as to "the exterior architectural features, height, appearance, color, and texture of the materials of exterior construction which is subject to public view from a public highway." The Commission was then required to report its recommendations as to whether the plans with respect to any building would preserve the historic value of said district and if not to suggest changes. Thus, while the Act referred to "places and areas" of historic interest, the operative features of the law were directed solely to buildings within the district and there was no showing made in this case that any buildings within the district would be affected by the Three Sisters Bridge or any of the ramps and interchanges that would be constructed under any plan. And as stated above, only a de minimis area at the southwest corner might be affected by the ramps and interchanges. The bridge itself would not touch the Old Georgetown District. Also the character of the so-called parkland on the north bank of the Potomac (the D.C. side) where the bridge abutments would be erected consists practically entirely of a railroad right-of-way, the Chesapeake and Ohio Canal and a public highway. Thus, any substantial interference with "green places" on the District of Columbia side of the river has not been demonstrated
 
 
 [4]
 Biographical data on Secretary of Transportation John A. Volpe indicates that he was born December 8, 1908, graduated from high school and following two years of night school majored in architectural construction at Wentworth Institute. He engaged in the construction business in Massachusetts from 1933 to 1943 when he volunteered for duty with the Civil Engineer Corps (Seabees) of the United States Navy. On his return to civilian life he held the rank of Lt. Commander and he then reopened his construction company. As the business grew, he set up offices in Washington, D. C. and Miami, Florida. He served as Commissioner of Public Works for the State of Massachusetts for four years beginning in 1953. In this position he undertook one of the largest highway construction programs in the history of Massachusetts. President Eisenhower named him as the first Federal Highway Administrator of the United States and he served in this position in 1956 and 1957 and thus became one of the architects of the $40 billion Interstate Highway Program initiated by the United States at that time. He is a member and past president of the Society of American Military Engineers and is also past president of the Associated General Contractors of America. He was also elected to three terms as Governor of Massachusetts. Congressional Directory, 92nd Cong., 1st Sess. 973 (1971)
 
 
 [5]
 Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L. Ed.2d 136 (1971)
 
 
 [6]
 The so-called Three Sisters Islands consist of nothing more than three small rocks which project above the waters of the Potomac River. At low tide they are connected by a small sand bar
 
 
 [7]
 23 U.S.C. Sec. 138
 
 
 [8]
 Majority opinion, p. 1239
 
 
 [9]
 D.C. Federation of Civic Associations v. Volpe, 316 F.Supp. 754, 775 (D.D.C. 1970)
 
 
 [10]
 23 U.S.C. Sec. 134
 
 
 [11]
 D.C. Federation of Civic Associations v. Volpe, supra note 9, 316 F.Supp. at 795
 
 
 [12]
 See page 1241 of majority opinion
 
 
 [13]
 316 F.Supp. at 794
 
 
 [14]
 Id
 
 
 [15]
 23 U.S.C. Sec. 134
 
 
 [16]
 316 F.Supp. at 775
 
 
 [17]
 Id. at 762
 
 
 [18]
 Pub.L. No. 90-495, 82 Stat. 815 (1968)
 
 
 [19]
 Fed.R.Civ.P. 52(a) provides:
 (a) Effect. In all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially and state separately its conclusions of law thereon, and judgment shall be entered pursuant to Rule 58; and in granting or refusing interlocutory injunctions the court shall similarly set forth the findings of fact and conclusions of law which constitute the grounds of its action. Requests for findings are not necessary for purposes of review. Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses. The findings of a master, to the extent that the court adopts them, shall be considered as the findings of the court. If an opinion or memorandum of decision is filed, it will be sufficient if the findings of fact and conclusions of law appear therein. Findings of fact and conclusions of law are unnecessary on decisions of motions under Rules 12 or 56 or any other motion except as provided in Rule 41(b).
 
 
 [20]
 United States v. Chemical Foundation, 272 U.S. 1, 14-15, 47 S.Ct. 1, 6, 71 L. Ed. 131 (1926) states:
 The presumption of regularity supports the official acts of public officers, and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties. Confiscation Cases, 20 Wall. 92, 108 [22 L.Ed. 320]; United States v. Page, 137 U.S. 673, 678-680 [11 S.Ct. 219, 34 L.Ed. 828]; United States v. Nix, 189 U.S. 199, 205 [23 S.Ct. 495, 47 L.Ed. 775].
 Oestereich v. Selective Service Bd. No. 11, 393 U.S. 233, 241, 89 S.Ct. 414, 21 L.Ed.2d 402 (1968) (Harlan, concurring), is to the same effect.
 
 
 [21]
 Sec. 23 of the Federal-Aid Highway Act of 1968 provides:
 Sec. 23 (a) Notwithstanding any other provision of law, or any court decision or administrative action to the contrary the Secretary of Transportation and the government of the District of Columbia shall, in addition to those routes already under construction, construct all routes on the Interstate System within the District of Columbia as set forth in the document entitled "1968 Estimate of the Cost of Completion of the National System of Interstate and Defense Highways in the District of Columbia" submitted to Congress by the Secretary of Transportation with, and as a part of, "The 1968 Interstate System Cost Estimate" printed as House Document Numbered 199, Ninetieth Congress. Such construction shall be undertaken as soon as possible after the date of enactment of this Act, except as otherwise provided in this section, and shall be carried out in accordance with all applicable provisions of title 23 of the United States Code.
 (b) Not later than 30 days after the date of enactment of this section the government of the District of Columbia shall commence work on the following projects:
 (1) Three Sisters Bridge, I-266 (Section B1 to B2).
 (2) Potomac River Freeway, I-266 (Section B2 to B4).
 (3) Center Leg of the Inner Loop, I-95 (Section A6 to C4), terminating at New York Avenue.
 (4) East Leg of the Inner Loop, I-295 (Section C1 to C4), terminating at Bladensburg Road.
 (c) The government of the District of Columbia and the Secretary of Transportation shall study those projects on the Interstate System set forth in "The 1968 Interstate System Cost Estimate", House Document Numbered 199, Ninetieth Congress, within the District of Columbia which are not specified in subsection (b) and shall report to Congress not later than 18 months after the date of enactment of this section their recommendations with respect to such projects including any recommended alternative routes or plans, and if no such recommendations are submitted within such 18-month period then the Secretary of Transportation and the government of the District of Columbia shall construct such routes, as soon as possible thereafter, as required by subsection (a) of this section. (82 Stat. 827-828)
 
 
 [22]
 If the present objectors were associated with the disapproval of the Three Sisters Bridge project in 1969 for reasons unrelated to its merits, it may be that they do not come into court with clean hands
 
 
 [1]
 P.L. 90-495, 82 Stat. 815, 827-828 (1968)
 
 
 [2]
 In our October 12, 1971, decision we stated in this connection, at footnote 62, as follows: "At issue are 16 U.S.C. Secs. 1, 470; 33 U.S.C. Secs. 401, 403, and 525; 49 U.S.C. Sec. 1655 (1970), and various sections of title 7 of the District of Columbia Code."
 
 
 [3]
 The relevant portion of Section 23 of the 1968 Act is as follows:
 Sec. 23. (a) Notwithstanding any other provision of law, or any court decision or administrative action to the contrary, the Secretary of Transportation and the government of the District of Columbia shall, in addition to those routes already under construction, construct all routes on the Interstate System within the District of Columbia as set forth in the document entitled "1968 Estimate of the Cost of Completion of the National System of Interstate and Defense Highways in the District of Columbia" submitted to Congress by the Secretary of Transportation with, and as a part of, "The 1968 Interstate System Cost Estimate" printed as House Document Numbered 199, Ninetieth Congress. Such construction shall be undertaken as soon as possible after the date of enactment of this Act, except as otherwise provided in this section, and shall be carried out in accordance with all applicable provisions of title 23 of the United States Code.
 (b) Not later than 30 days after the date of enactment of this section the government of the District of Columbia shall commence work on the following projects:
 (1) Three Sisters Bridge, I-266 (Section B1 to B2).
 (2) Potomac River Freeway, I-266 (Section B2 to B4).
 (3) Center Leg of the Inner Loop, I-95 (Section A6 to C4), terminating at New York Avenue.
 (4) East Leg of the Inner Loop, I-295 (Section C1 to C4), terminating at Bladensburg Road.
 
 
 [82]
 Stat. 827 (1968)
 
 
 [4]
 We are of course not called upon to pass upon any provisions of law not invoked by appellants, whether local or otherwise
 
 
 [5]
 The 1968 correspondence to which Judge MacKinnon refers in this connection is inconclusive in its submission to the Advisory Council and in the Council's response
 
 
 [1]
 The Department of Transportation became a department of the United States, effective April 1, 1967. Exec. Order No. 11340, March 30, 1967, 32 Fed.Reg. 5453; 49 U.S.C.A. Sec. 1651 note; Department of Transportation Act, Pub.L. 89-670, October 15, 1966, 80 Stat. 931.)
 
 
 [2]
 Letter dated Feb. 8, 1968 from Mr. Mackey to Dr. Stevens, Def.'s Ex. 21, App. II at 529A; two letters dated Feb. 9, 1968 from Dr. Stevens to Mr. Mackey, Pltf.'s Exs. 63 & 64, App. II at 389A & 390A; letter dated Feb. 14, 1968 from Mr. Mackey to Dr. Stevens, Def.'s Ex. 36
 
 
 [1]
 Lumbermen's Mutual Casualty Co. v. Wright, 322 F.2d 759, 763-764 (5th Cir. 1963); Mayflower Hotel Stockholders Protective Com. v. Mayflower Hotel Corp., 89 U.S.App.D.C. 171, 193 F.2d 666, 669 (1951); General American Life Ins. Co. v. Anderson, 156 F.2d 615, 618-619 (6th Cir. 1946); White v. Higgins, 116 F.2d 312, 317 (1st Cir. 1940); Chicago, St. P., M. & O. Ry. v. Kulp, 102 F.2d 352, 354 (8th Cir.), cert. denied. 307 U.S. 636, 59 S.Ct. 1032, 83 L.Ed. 1518 (1939); Reynolds Spring Co. v. L. A. Young Industries, 101 F.2d 257, 259 (6th Cir. 1939)
 
 
 [2]
 White v. Higgins, supra note 1
 
 
 [3]
 1256